No. 26-1071

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

SOUTHERN ALLIANCE FOR CLEAN ENERGY, 7 DIRECTIONS OF SERVICE, APPALACHIAN VOICES, BLUE RIDGE ENVIRONMENTAL DEFENSE LEAGUE, CHESAPEAKE CLIMATE ACTION NETWORK, SIERRA CLUB, and WILD VIRGINIA,

*Petitioners*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent.*

## JOINT PETITION FOR REVIEW

Pursuant to Section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b), and Rule 15(a) of the Federal Rules of Appellate Procedure, Petitioners Southern Alliance for Clean Energy, 7 Directions of Service, Appalachian Voices, Blue Ridge Environmental Defense League, Chesapeake Climate Action Network, Sierra Club, and Wild Virginia (collectively, "Petitioners") hereby petition the Court for review of the following orders of the Federal Energy Regulatory Commission ("Commission"):

1.  Order Amending Certificate, *Mountain Valley Pipeline, LLC*, Dkt. No. CP25-60-000, 193 FERC ¶ 61,222 (Dec. 18, 2025) (attached as Exhibit A); and

2.  Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, *Mountain Valley Pipeline, LLC*, Dkt. No. CP25-60-001, 194 FERC ¶ 62,087 (Feb. 20, 2026) (attached as Exhibit B).

These orders concern the Commission's amendment of the certificate of public convenience and necessity that the Commission previously issued to Mountain Valley Pipeline, LLC ("MVP") for the Southgate Project. The amended certificate authorizes MVP to construct and operate the Amendment Project, a 31.3-mile pipeline and appurtenant facilities that would transport gas from Pittsylvania County, Virginia, to Rockingham County, North Carolina.

Petitioners and their members have been and will be aggrieved by the approval, construction, and operation of the Amendment Project. Petitioners were intervenors before the Commission in the proceedings below and timely requested rehearing of the Order Amending Certificate. The Commission issued its Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration on February 20, 2026. This Court has jurisdiction and this petition is timely under Section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b).

In accordance with Rule 15(c) of the Federal Rules of Appellate Procedure, the list of parties served with copies of this Joint Petition for Review is attached as Exhibit C.

DATED: March 31, 2026

Respectfully submitted,

*/s/ Mark Sabath*
Mark Sabath
Southern Environmental Law Center
500 New Jersey Ave. NW, Suite 600
Washington, DC 20001
(434) 977-4090
msabath@selc.org

Tyler Demetriou
Southern Environmental Law Center
120 Garrett Street, Suite 400
Charlottesville, VA 22902
(434) 977-4090
tdemetriou@selc.org

*Counsel for Southern Alliance for Clean Energy and 7 Directions of Service*

*/s/ Benjamin A. Luckett*
Benjamin A. Luckett
Appalachian Mountain Advocates
PO Box 507
Lewisburg, WV 24901
(304) 873-6080
bluckett@appalmad.org

*Counsel for Appalachian Voices, Blue Ridge Environmental Defense League, Chesapeake Climate Action Network, Sierra Club, and Wild Virginia*

*/s/ Elizabeth F. Benson*
Elizabeth F. Benson
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5723
elly.benson@sierraclub.org

*Counsel for Sierra Club*

# CERTIFICATE OF SERVICE

I certify that, on March 31, 2026, copies of this Joint Petition for Review and exhibits were served on all parties admitted to participate in the agency proceedings by email to the official service list in Federal Energy Regulatory Commission Docket Nos. CP25-60-000 and CP25-60-001. As required by Rule 15(c)(2) of the Federal Rules of Appellate Procedure, a list of those so served is attached as Exhibit C.

In accordance with D.C. Circuit Rule 15(a), I further certify that a copy of the foregoing was served by U.S. Postal Service mail to the following:

Debbie-Anne A. Reese, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E., Room 1A
Washington, DC 20426

A copy of the foregoing was also served by email to:

Robert Solomon, Solicitor
Federal Energy Regulatory Commission
888 First Street, N.E., Room 101-01
Washington, DC 20426
robert.solomon@ferc.gov

DATED: March 31, 2026              /s/ Mark Sabath
                                   Mark Sabath
                                   Southern Environmental Law Center

# Exhibit A

Order Amending Certificate, *Mountain Valley Pipeline, LLC*, Dkt. No. CP25-60-000, 193 FERC ¶ 61,222 (Dec. 18, 2025)

193 FERC ¶ 61,222
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Laura V. Swett, Chairman;
David Rosner, Lindsay S. See,
Judy W. Chang, and David LaCerte.

Mountain Valley Pipeline, LLC                    Docket No. CP25-60-000

ORDER AMENDING CERTIFICATE

(Issued December 18, 2025)

1.      On February 3, 2025, Mountain Valley Pipeline, LLC, (Mountain Valley) filed an application pursuant to section 7(c) of the Natural Gas Act (NGA)[1] and Part 157 of the Commission's regulations[2] to amend its certificate of public convenience and necessity, issued in Docket No. CP19-14-000, which authorized Mountain Valley to construct and operate the Southgate Project in Pittsylvania County, Virginia, and Rockingham and Alamance Counties, North Carolina (Amendment Project or Southgate Amendment Project).[3]  Among other changes, Mountain Valley proposes to reduce the length of the pipeline route from 75 miles to 31.3 miles and increase the diameter of the project pipeline to 30 inches.[4]  The Southgate Amendment Project would enable Mountain Valley to provide 550,000 dekatherms per day (Dth/d) of firm transportation service from Pittsylvania County, Virginia, to Rockingham County, North Carolina.  For the reasons discussed below, we grant the requested amendment, subject to the conditions described herein.

---

[1] 15 U.S.C. § 717f(c).

[2] 18 C.F.R. pt. 157 (2025).

[3] *See Mountain Valley Pipeline, LLC*, 171 FERC ¶ 61,232 (Certificate Order), *order on reh'g*, 172 FERC ¶ 61,261 (2020) (Rehearing Order), *aff'd sub. nom.*, *Sierra Club v. FERC*, 38 F.4th 220 (D.C. Cir. 2022).

[4] The previously certified project consisted of approximately 31 miles of 24-inch pipeline and 44 miles of 16-inch pipeline.

## I.     Background and Proposal

2.     Mountain Valley,[5] a Delaware limited liability company, is a natural gas company as defined by section 2(6) of the NGA.[6]  Mountain Valley's Mainline System currently transports up to 2 billion cubic feet per day of natural gas from Wetzel County, West Virginia, to Transcontinental Gas Pipeline Company, LLC's (Transco) Zone 5 compressor station 165 in Pittsylvania County, Virginia.[7]

3.     On June 18, 2020, the Commission issued Mountain Valley a certificate of public convenience and necessity authorizing the construction and operation of the Southgate Project, which was designed to provide up to 375,000 Dth/d of firm transportation service from an interconnect in Pittsylvania County, Virginia, to delivery points in Rockingham and Alamance Counties, North Carolina (Certificate Order).  The Public Service Company of North Carolina, Inc. (PSNC), the sole project shipper, executed a precedent agreement for 300,000 Dt/d.[8]  The previously authorized pipeline and compression facilities consisted of:

- approximately 31 miles of 24-inch-diameter natural gas pipeline in Pittsylvania County, Virginia, and Rockingham County, North Carolina;

- approximately 44 miles of 16-inch-diameter natural gas pipeline in Rockingham and Alamance Counties, North Carolina;

- one 28,915-horsepower compressor station, including two natural gas-fired turbine-driven compressor units, in Pittsylvania County, Virginia (Lambert Compressor Station);

---

[5] Five companies own Mountain Valley:  EQM Midstream Partners, LP (45.5%); NextEra Energy (31%); Con Edison Transmission, Inc. (12.5%); WGL Midstream (10%); and RGC Midstream, LLC (1%).

[6] 15 U.S.C. § 717a(6).

[7] Mountain Valley completed construction of its Mainline System in June 2024 and placed it into service on June 14, 2024.

[8] Certificate Order, 171 FERC ¶ 61,232 at PP 11-12.  Following a January 2019 merger, Dominion Energy, Inc. acquired PSNC and changed the name to Dominion Energy North Carolina.  *See id.* n. 16.  The Certificate Order referred to the shipper as Dominion.  In October 2024, Dominion sold PSNC to Enbridge, Inc.  This order refers to the shipper as PSNC.

Docket No. CP25-60-000                                                          - 3 -

- four interconnects and associated meter stations; and

- ancillary facilities including pig launchers and receivers,[9] mainline block valves, and cathodic protection beds.

4.     Mountain Valley has not submitted a request to begin construction of the Southgate Project.

5.     In its amendment application, Mountain Valley requests to reduce the length of the certificated project by more than half, which results in substantially fewer water body crossings, to no longer construct the Lambert Compressor Station, and to increase the diameter of the project pipeline.  The Amendment Project would enable Mountain Valley to provide 550,000 Dth/d of firm transportation service to project shippers (i.e., 175,000 Dth/d more than the originally certificated Southgate Project).

6.     Specifically, Mountain Valley requests that the Commission amend its certificate authorization to enable Mountain Valley to construct, install, modify, and operate the following natural gas facilities:

- approximately 31.3 miles of 30-inch-diameter natural gas pipeline in Pittsylvania County, Virginia, and Rockingham County, North Carolina;[10]

- four interconnects and associated meter stations; and

- ancillary facilities including pig launchers and receivers, mainline block valves, and cathodic protection beds.

7.     Mountain Valley held an open season from February 2 to February 6, 2024, to solicit interest in the Amendment Project.[11]  As a result of the open season, Mountain Valley executed binding long-term precedent agreements with two unaffiliated shippers, Duke Energy Carolina, LLC (Duke Energy) for 250,000 Dth/day of firm transportation capacity and PSNC for 300,000 of firm transportation service, reflecting 100% of the project's total capacity, with terms of 20 years.[12]

---

[9] A "pig" is a device used to clean or inspect the interior of a pipeline.

[10] With minor deviations, the pipeline follows the same route and is within the same footprint as the previously certificated project.

[11] Mountain Valley February 3, 2025 Application at 4 (Application).

[12] Application at 4.

Docket No. CP25-60-000                                                              - 4 -

8.      The estimated cost of the Amendment Project is approximately $524 million.[13] Mountain Valley proposes no changes to the separate Southgate System rate zone that was approved in the Certificate Order.[14]

## II.     Procedural Issues

### A.      Notice, Interventions, Protests, and Comments

9.      Notice of Mountain Valley's application was issued on February 18, 2025, and published in the Federal Register on February 24, 2025.[15]  The notice established March 11, 2025, as the deadline for filing comments and interventions.  PSNC, Kellie Ferguson, Natural Gas Supply Association, Duke Energy Carolinas, LLC and Duke Energy Progress, LLC (jointly), Crystal Cavalier, Center for Biological Diversity, Center for LNG, Andrew Hinz, Southern Alliance for Clean Energy et al.,[16] American Gas Association, Public Citizen, Inc., Transcontinental Gas Pipe Line Company, LLC, Aminah Ghaffar, Seth Harris, Appalachian Voices et al.,[17] and Protect Our Water, Heritage, Rights filed timely, unopposed motions to intervene.[18]

10.     As discussed further below, the Commission received numerous comments from individuals and groups regarding various issues.  Commenters in support of the project

---

[13] *Id.*, Ex. K at 1.

[14] *Id.*, Ex. K at 9.  The Certificate Order approved Mountain Valley to provide Firm (Rate Schedule FTS), Interruptible (Rate Schedule ITS), and Interruptible Parking and Lending (Rate Schedule ILPS) transportation services under a separate rate zone called the Southgate System.

[15] 90 Fed. Reg. 10479 (Feb. 24, 2025).

[16] Joint intervention of Southern Alliance for Clean Energy, 7 Directions of Service, Katie Whitehead, and Robert McNutt.

[17] Joint intervention of Appalachian Voices, Blue Ridge Environmental Defense League, Center for Biological Diversity, Chesapeake Climate Action Network, Natural Resources Defense Council, Sierra Club, and Wild Virginia, Inc. (Appalachian Mountain Advocates).

[18] Timely, unopposed motions to intervene are granted by operation of Rule 214 of the Commission's Rules of Practice and Procedure.  18 C.F.R. § 385.214(c) (2025).  On March 12, 2025, the Piedmont Natural Gas Company, Inc. and the Terry Family filed untimely motions to intervene, which were denied by Secretary's Notice on May 23, 2025.

Docket No. CP25-60-000                                                                - 5 -

assert that the project will provide benefits such as meeting increased demand, enhancing system reliability, increasing access to lower priced natural gas, and supporting jobs. Commenters in opposition to the project raise issues including project purpose and need, alternatives, the proposed rate of return on equity, erosion and sedimentation, air quality, noise, socioeconomic impacts, cumulative impacts, safety, tribal consultation, greenhouse gases (GHG), and climate change.  These concerns are addressed in the Environmental Assessment (EA) issued for the project and, as appropriate, below.

### B.       Answer

11.    Mountain Valley filed an answer to the comments filed in response to the notice of application.[19]  Although the Commission's Rules of Practice and Procedure do not permit answers to protests or answers to answers, we find good cause to waive our rules and accept the answer because it provides information that has assisted in our decision-making process.[20]

### C.       Motion to Lodge and Protest

12.    On November 21, 2025, Southern Alliance for Clean Energy, 7 Directions of Service, Katie Whitehead, and Robert McNutt filed a joint motion to lodge a report prepared by London Economics International LLC (LEI) that evaluates demand for firm natural gas transportation capacity on the Amended Project.  Also on November 21, 2025, the same entities, joined by other non-governmental organizations, filed a protest, alleging that Mountain Valley has not sufficiently demonstrated need for the Amendment Project, referencing in part the November 2025 LEI report.  On December 3, 2025, Mountain Valley, and on December 8, 2025, Duke Energy and PSNC filed answers to the protest and motion to lodge.  Subsequently, on December 16, 2025, Southern Alliance for Clean Energy and 7 Directions of Service filed a motion to lodge a report prepared by Greenlink Analytics and Science for Georgia that examines the impacts of projected data center growth on power demand in the Southeast.  On December 17, 2025, Mountain Valley filed an answer to the motion to lodge.

13.    The November 2025 LEI report and protest were filed over 8 months after the close of the comment period established by the Notice of Application.[21]  The movants offer no justification for why their filings were so delayed.  The December 2025 report

---

[19] Mountain Valley March 26, 2025 Answer.

[20] *See* 18 C.F.R. § 385.213(a)(2) (2025).

[21] The report and protest were also filed outside of the comment period established for the EA, *infra* P 47, and we further note that the filings do not offer any comments on EA.

was filed even later, over 9 months after the close of the comment period.  Because the motions were made at an extremely late stage of the proceeding, we deny the motions to lodge and reject the protest.  Accordingly, we also do not consider the answers filed by Mountain Valley, Duke Energy, and PSNC.

## D.    New Certificate Application

14.    Various commenters argue that Mountain Valley should be required to submit a new application for a certificate of public convenience and necessity rather than be allowed to amend its existing certificate.  These commenters argue that the Amendment Project represents a "substantial departure from the Southgate Project" due to the larger diameter pipe and the corresponding increase in capacity.[22]  Mountain Valley responds that the Amendment Project is not markedly different from the originally certificated project except that it reduces the scope and impacts of the project by eliminating nearly 44 miles of pipeline and a compressor station.  It maintains that what remains is "substantially identical to the Certificated Project."[23]

15.    Section 16 of the NGA provides the Commission with broad authority to amend its orders.[24]  As noted above, with the exception of minor deviations, the Amendment Project follows the same route and is largely within the same footprint as the previously certificated project.[25]  Here, we reasonably scale our analysis to the scope of amendment.  The order is supported by a new certificate policy statement analysis and environmental review that analyzed all environmental impacts not previously considered.  There was the same level of notice and opportunity for comment as if this had been a new certificate application.  Commenters do not point to any way that the amendment proceeding curtailed due process.

---

[22] Appalachian Mountain Advocates March 11, 2025 Intervention and Protest at 2.

[23] Mountain Valley March 26, 2025 Answer at 3.

[24] 15 U.S.C. § 717o (broadly granting the Commission "the power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this act").

[25] *See supra* PP 2-5.

## III.    Discussion

16.    Because Mountain Valley's requested changes require amending the Certificate Order, the requests are subject to the requirements of NGA section 7, subsections (c) and (e).[26]

### A.    Certificate Policy Statement

17.    The Certificate Policy Statement provides guidance for evaluating proposals to certificate new construction.[27]  The Certificate Policy Statement establishes criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest.  It explains that, in deciding whether and under what terms to authorize the construction of new pipeline facilities, the Commission balances public benefits against potential adverse consequences.  The Commission's goal is to appropriately consider the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new pipeline construction.

18.    Under this policy, the threshold requirement for an applicant proposing a new project is that the applicant must be prepared to financially support the project without relying on subsidization from its existing customers.  The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, and landowners and communities affected by the route of the new pipeline facilities.  If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects.  This is essentially an economic test.  Only when the benefits outweigh the adverse effects on economic interests will the Commission proceed to complete the environmental analysis, where other interests are considered.

### 1.    No Subsidy Requirement

19.    As discussed above, the threshold requirement is that the applicant must be prepared to financially support the project without relying on subsidization from its

---

[26] 15 U.S.C. §§ 717f(c), (e).

[27] *Certification of New Interstate Nat. Gas Pipeline Facilities*, 88 FERC ¶ 61,227, *corrected*, 89 FERC ¶ 61,040 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).

existing customers. The Certificate Order found that "once operation of the Mainline System commences, there would be no risk that existing Mainline System customers would be subsidizing service on the Southgate Project."[28] The Commission explained that Mountain Valley would establish a separate rate zone for service on the Southgate Project, which would ensure that the cost of the project, and the risks inherent in it, would be borne by Mountain Valley and the Southgate Project customers, and not the Mainline System customers.[29] Mountain Valley proposes no changes to the approved rate zone for the Amendment Project.[30] Accordingly, the reasoning in the Certificate Order holds here and we similarly find that there is no risk that existing Mainline System customers will subsidize service on the Southgate Project.

### 2.    Project Need

20.    Mountain Valley has entered long-term precedent agreements with shippers for 100% of the project's capacity.

21.    Mountain Valley argues that market need for the project has only grown since the Commission issued the Certificate Order, noting that the open season for the Amendment Project resulted in precedent agreements for 550,000 Dth/d of firm transportation capacity as compared to 300,000 Dth/d for the originally certificated project. It states that the North Carolina Utilities Commission has expressed support for the shippers' acquisition of incremental transportation and that the Amendment Project offers the most efficient and cost-effective way to meet increasing demand, enhance reliability, and increase supply diversity.[31]

22.    Commenters in support of the Amendment Project argue that the project's added capacity is needed to meet future demand in the region and to enhance reliability and economic development.[32]

---

[28] Certificate Order, 171 FERC ¶ 61,232 at P 25.

[29] *Id.*

[30] Application at 9.

[31] *Id.* at 11-12.

[32] *See, e.g.*, U.S. House of Representatives John McGuire and Virginia Foxx March 11, 2025 Comments; Director of the Virginia Department of Energy, Glenn Davis, March 10, 2025 Comments.

23.     Duke Energy, a project shipper, states that the project addresses a significant market need and is a critical piece of its natural gas transportation strategy.[33]  Duke Energy states that, until new low-carbon or zero-carbon fuels become economically available for utility-scale use in dispatchable generation, incremental natural gas capacity will be required to maintain least-cost and reliable operations.[34]  It states that the Amendment Project will allow Duke Energy to increase lower-cost deliveries from Mountain Valley's Mainline and that if access to this supply is not available, it would need to rely on alternate fuel supplies that it estimates would result in increased costs and price volatility for its customers.[35]  Duke Energy also argues that the project has been indirectly endorsed by the North Carolina Utilities Commission and Public Service Commission of South Carolina, the state utility commissions that regulate Duke Energy, by approving Duke Energy's respective integrated resource plans and acknowledging the need for incremental gas capacity to the Carolinas to assist with the reliable operation of the electric system.[36]  It also avers that the project will facilitate the retirement of aging coal facilities by bringing dispatchable generation online to complement higher levels of intermittent generation, which will play a critical role in achieving overall carbon emission reductions consistent with North Carolina Law.[37]

24.     PSNC, a project shipper, states that the project will:  (i) help it meet increasing demand for natural gas; (ii) provide PSNC with access to capacity it holds on Mountain Valley's Mainline, which constitutes the best-cost alternative to satisfy its capacity needs; (iii) increase reliability, resiliency, and direct access to low-cost natural gas shale regions; (iv) contribute to the optionality of natural gas supply sources; (v) allow PSNC to replace secondary-firm backhaul[38] deliveries with primary-firm forward-haul deliveries; and (vi) operate using a minimum delivery pressure guarantee, increasing PSNC's confidence in its system modeling and leading to operational enhancements.[39]  PSNC notes that it has seen increased constraints and continued reductions to operational flexibility on the Transco system due to the rapid rise of daily Operational Flow Orders that often

---

[33] Duke Energy March 10, 2025 Comments at 4.

[34] *Id.*

[35] *Id.* at 7-8.

[36] *Id.* at 5-6.

[37] *Id.* at 6-7.

[38] Backhaul refers to transportation service where a shipper's delivery point is upstream of the receipt point.

[39] PSNC March 20, 2025 Comments at 3.

Docket No. CP25-60-000                                                          - 10 -

significantly limit PSNC's service options in both directions on that pipeline.[40]  PSNC describes the issues it had with the Transco system during the abnormally cold weather of Winter Storm Elliot in 2022, when the Transco system experienced historically low operating pressures such that PSNC could not bring enough natural gas supply onto its distribution system and had to take emergency action for its end-use customers.[41]

25.     Appalachian Mountain Advocates and various commenters challenge the need for the Southgate Amendment Project.[42]  Crystal Cavalier states that the project is not needed because Mountain Valley did not submit an independent market analysis.[43] Appalachian Mountain Advocates and others allege that natural gas demand projections are inflated and that the demand for natural gas to power artificial intelligence (AI) adoption and accompanying data center buildout will not materialize.[44]  Appalachian Mountain Advocates filed a report prepared by the Institute for Energy Economics and Financial Analysis (IEEFA) that concludes there is a risk of utilities in the southeast overbuilding pipelines in response to projected data center energy demand because forecasted data centers may never be built.[45]  The report finds that ratepayers will subsidize the infrastructure needed to serve data centers and that the subsidization will only worsen if infrastructure is overbuilt.[46]  Additionally, the Southern Alliance for Clean Energy filed a report, prepared by LEI, that contends that projected electricity demand from data centers may be flawed due to inherent upward bias that overstates actual infrastructure needs.[47]  The LEI Report identifies a "phantom load" problem, which is

---

[40] *Id.* at 5.

[41] *Id.* at 6.

[42] *See, e.g.*, Appalachian Mountain Advocates March 11, 2025 Intervention and Protest; Hallie Trauger March 5, 2025 Comments; Molly Morabito March 7, 2025 Comments; Amanda Siemens March 11, 2025 Comments.

[43] Crystal Cavalier March 10, 2025 Comments at 3.

[44] Appalachian Mountain Advocates March 11, 2025 Intervention and Protest; Southern Alliance for Clean Energy July 28, 2025 Motion and Comments.

[45] Appalachian Mountain Advocates March 11, 2025 Intervention and Protest, Ex. 4 (IEEFA Report).

[46] *Id.* at 24.

[47] Southern Alliance for Clean Energy et al. July 28, 2025 Comments, attach. A (LEI Report).

that data center developers have incentives to submit multiple, redundant interconnection requests across several utility jurisdictions, creating a structural upward bias in forecasts.[48]  The report also concludes that the global supply chain of semiconductor chips is inadequate to support projected data center demand in the United States.[49]

26.     Transco comments that its proposed Southeast Supply Enhancement Project could handle all of the Southgate Amendment Project capacity with only minor alterations within its currently proposed footprint.[50]  Appalachian Voices argues that "Transco could technically, practically and economically eliminate the need for the proposed Southgate project."[51]

27.     Precedent agreements for an expansion project's entire capacity support a finding of project need.[52]  Although market studies may provide evidence of need under the Certificate Policy Statement, they are not required for such a finding.[53]  The Commission has continuously found that precedent agreements are the best evidence that the service to be provided by the project is needed to connect supply and demand, as precedent agreements involve parties engaging in negotiations for pipeline transportation services to meet individualized needs.[54]  The Commission will not look beyond precedent

---

[48] *Id.* at 13-14.  *See also id.* at 15 (citing Georgia Public Service Commission Docket No. 55378, *Microsoft's Comments on Georgia Power's 2023 Integrated Resource Plan Update* 1, 4 (Apr. 1, 2024), https://psc.ga.gov/search/facts-document/?documentId=218199).

[49] LEI Report at 32-33.

[50] Transco March 11, 2025 Intervention and Comments at 6-7.  Transco's Southeast Supply Enhancement Project is currently pending before the Commission in Docket No. CP25-10-000.

[51] Appalachian Voices November 3, 2025 Comments at 2.

[52] *Gas Trans. Nw., L.L.C. v. FERC*, No. 24-60002, 2025 WL 3011078, at *16 (5th Cir. Oct. 28, 2025) ("If a pipeline secures precedent agreements for an expansion project's entire capacity, FERC's decision to grant a § 7 certificate is supported by 'substantial evidence' under the APA.") (citations omitted).

[53] Certificate Policy Statement, 88 FERC at 61,747.

[54] *Transcon. Gas Pipe Line Co., LLC*, 190 FERC ¶ 61,048, at PP 27, 29 (2025).

agreements to assess need by other means unless there is credible, contrary evidence discounting their probative value.[55]

28.     No such evidence exists here.  While the LEI Report and IEEFA Report question the credibility of regional load growth forecasts, we find that legitimate electricity demand drivers clearly exist from the concentration of data centers and the incorporation of those proposals in recently approved utility integrated resource plans, such as the ones noted by Duke Energy above.[56]  Regarding the IEEFA Report's conclusion that ratepayers will subsidize infrastructure needed to serve data centers, we note that Mountain Valley's precedent agreements with project shippers do not constrain that the capacity be delivered to specific defined facilities, and the Commission does not regulate or track how shippers decide to flow natural gas downstream.  Rather, for the shippers that are public utilities, state public utility commissions regulate the utilities' use of natural gas transported and the rates the utilities charge to ratepayers.[57]  Moreover, the Commission views transportation service for all shippers as providing public benefits and does not weigh end uses differently for the purpose of determining need for a project.

29.     Allegations that the project is not needed because Transco's proposed Southeast Supply Enhancement Project could handle the Amendment Project volumes are not persuasive.  The Commission's role under the NGA is to decide "whether to adopt an applicant's proposal and, if so, to what degree,"[58] and, as noted, consider the enhancement of competitive transportation alternatives.[59]  Here, the project's purpose is

---

[55] *Gas Trans. Nw., L.L.C. v. FERC*, No. 24-60002, 2025 WL 3011078 at *16 (citations omitted).

[56] *See supra* P 23 (citing Duke Energy March 10, 2025 Comments at 5-6).

[57] *See, e.g.*, *id.* (explaining that the North Carolina Utilities Commission and Public Service Commission of South Carolina regulate the rates Duke Energy charges customers); *Transcon. Gas Pipe Line Co., LLC*, 192 FERC ¶ 61,134, at P 37 n.157 (2025) (citing *Nat. Gas Pipeline Co. of Am.*, 20 FERC ¶ 61,324, at 61,674 (1982) (citing *Panhandle E. Pipe Line Co. v. Mich. Pub. Serv. Comm'n*, 341 U.S. 329, 333 (1951) and *Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n of Ind.*, 332 U.S. 507, 513-14 (1947))) (explaining that the consideration and review by the Commission of prices paid by end users to local distribution companies in sales are "expressly and affirmatively committed to State and local authority by the provisions of Sections 1(b) and Section 1(c) of the [NGA]").

[58] *Gas Transmission Nw., LLC*, 185 FERC ¶ 61,035, at P 24 (2023) (internal quotation and citation omitted).

[59] *Supra* P 17.

to serve the firm natural gas transportation requirements of Mountain Valley's shippers to meet increased demand,[60] provide access to lower-cost gas,[61] enhance reliability,[62] and offer other operational benefits.[63]  The Commission does not look behind such agreements to assess shippers' business decisions,[64] but we note that the record does not establish that contracting for capacity on the proposed Southeast Supply Enhancement Project would satisfy the needs expressed by the project shippers in this proceeding.  Had the shippers wanted to contract for capacity (or in the case of Duke Energy, additional capacity[65]) on the Transco line, they could have done so.  Transco held its open season in June 2023,[66] and the shippers still chose to execute precedent agreements with Mountain Valley in February 2024, when it held its open season.[67]  As the Commission has previously stated,

> [w]hile the Certificate Policy Statement permits the applicant to show need in a variety ways, it does not suggest that the Commission should examine a group of projects together and pick which projects best serve an estimated future regional demand. . . .  [T]he Commission evaluates individual projects based on the evidence of need presented in each proceeding.[68]

---

[60] Duke Energy March 10, 2025 Intervention and Comments at 8; PSNC March 20, 2025 Comments at 2-3.

[61] Duke Energy March 10, 2025 Intervention and Comments at 7-8; PSNC March 20, 2025 Comments at 3.

[62] Duke Energy March 10, 2025 Intervention and Comments at 4 & 6-8; PSNC March 20, 2025 Comments at 1 & 3-7; Duke Energy November 3, 2025 Comments at 4 & 8-9.

[63] PSNC March 20, 2025 Comments at 3 & 5-7; Duke Energy November 3, 2025 Comments at 6-7.

[64] *Atl. Coast Pipeline, LLC*, 164 FERC ¶ 61,100, at P 41 (2018).

[65] Duke Energy also contracted for capacity on the Southeast Supply Enhancement Project and supports both projects.  Duke Energy November 3, 2025 Comments at 9.

[66] Transco, Application, Docket No. CP25-10-000, at 18 (filed Oct. 29, 2024).

[67] Application at 4.

[68] *Atl. Coast Pipeline, LLC*, 161 FERC ¶ 61,042 (2017).

30.     Here, Mountain Valley entered into precedent agreements with Duke Energy and PSNC for 100% of the Southgate Amendment Project's capacity.  Accordingly, we find that the Amendment Project will not lead to the overbuilding of pipeline infrastructure and will provide needed natural gas transportation service.[69]

### 3.      Impacts on Existing Customers, Existing Pipelines and Their Customers, and Landowners and Surrounding Communities

31.     The Certificate Order found that the Southgate Project would not cause a degradation in service to Mountain Valley's Mainline System customers,[70] and we continue to reach the same conclusion regarding the Amendment Project.   Additionally, we find that there will be no adverse impact on other pipelines in the region or their captive customers.  The Southgate Amendment Project will provide up to 550,000 Dth/d of incremental firm transportation service in North Carolina and southern Virginia.  No transportation service provider or captive customer have raised concerns regarding adverse affects.  Therefore, we find that the Southgate Project will have no adverse impact on existing pipelines or their captive customers.

32.     The Certificate Order found that Mountain Valley had "taken appropriate steps to minimize adverse impacts on landowners."[71]  As discussed in greater detail in the EA the Amendment Project was designed to reduce impacts to landowners and surrounding communities as compared to the certificated project.  Mountain Valley states that it has acquired 100% of the easements required for the Amendment Project in North Carolina and more than 95% of the easements (by tract) in Virginia.[72]  We find that Mountain

---

[69] *See, e.g.*, *Transcon. Gas Pipe Line Co., LLC*, 190 FERC ¶ 61,048 at P 29 (affirming that precedent agreements are the best evidence of need); *Tex. Gas Transmission, LLC*, 181 FERC ¶ 61,049 (2022) (finding a long-term precedent agreement for almost 100% of the project's capacity is significant evidence of need for the proposed project).  *See also Sierra Club v. FERC*, 38 F.4th at 230 (finding a long-term precedent agreement for 80% of the project's capacity showed an actual need for the project); *Appalachian Voices v. FERC*, No. 17-1271, 2019 WL 847199, at *1 (D.C. Cir. Feb. 19, 2019) (unpublished) (finding the Commission's conclusion that there is a market need for the project was reasonable and supported by substantial evidence, in the form of long-term precedent agreements for 100% of the project's capacity).

[70] Certificate Order, 171 FERC ¶ 61,232 at P 25.

[71] *Id.* P 27.

[72] Application at 10.

Valley has taken appropriate steps to minimize adverse economic impacts on landowners and surrounding communities.

### 4.     Certificate Policy Statement Conclusion

33.     The Southgate Amendment Project will provide 550,000 Dth/d of incremental firm transportation service.  Mountain Valley has entered into binding agreements for 100% of the project's capacity.  We find that Mountain Valley has demonstrated a need for the project, and, further, that the project will not have adverse impacts on existing shippers or other pipelines and their existing customers, and that the project will have minimal economic effects on landowners and surrounding communities.  Therefore, we conclude that the project is consistent with the criteria set forth in the Certificate Policy Statement and analyze the project's environmental impacts below.[73]

### B.     Rates

### 1.     Initial Recourse Rates

34.     The Certificate Order authorized Mountain Valley to provide firm, interruptible, and interruptible lending and parking transportation services under a separate rate zone called the Southgate System.[74]  Mountain Valley states that it is not proposing changes to the accepted rate zone structure as part of the Amendment Project.[75]

35.     Mountain Valley developed its revised cost of service using the same underlying factors that were authorized in the Certificate Order, including a capital structure of 50% debt and 50% equity, a proposed cost of debt of 6%, a return on equity (ROE) of 14%, and a 2.5% depreciation rate.[76]  Mountain Valley uses a straight fixed-variable rate design to derive its rates based on the full project design capacity of 550,000 Dth/d and a first-year cost of service of $82,803,530.[77]  Mountain Valley calculates a revised maximum monthly firm recourse reservation charge of $12.4645 per Dth based on a first-year fixed cost of service of $82,265,534 and annual billing determinants of 6,600,000

---

[73] *See* Certificate Policy Statement, 88 FERC at 61,745-46 (explaining that only when the project benefits outweigh the adverse effects on the economic interests will the Commission then complete the environmental analysis).

[74] Certificate Order, 171 FERC ¶ 61,232 at PP 53-54.

[75] Application at 16.

[76] *Id.*; Certificate Order, 171 FERC ¶ 61,232 at P 54.

[77] Application, Ex. N at 1.

Dth.[78]  Mountain Valley also calculates a revised daily firm usage charge of $0.0027 based on a first-year variable cost of service of $537,996 and annual billing determinants of 200,750,000 Dth.  Mountain Valley proposes a revised maximum interruptible rate of $0.4125 per Dth/d and an interruptible lending and parking rate of $0.4125 per Dth/d based on the maximum daily Rate Schedule FTS reservation charge plus the usage charge.  In addition, Mountain Valley notes that its Rate Schedule for Enhanced Firm Transportation Service (EFT) was approved in Docket No. RP24-682-000 for mainline service.[79]  Accordingly, Mountain Valley proposes a monthly reservation charge of $18.6967 and usage charge of $0.0027 under Rate Schedule EFT for the Southgate System.

36.     We have reviewed Mountain Valley's proposed revised cost of service and revised initial rates and find that they are consistent with current Commission policy, with the exception of the ROE as discussed below.

## 2.     Return on Equity

37.     The Commission has stated that a 14% ROE is an appropriate incentive for new pipeline companies to enter the market.[80]  Because new entrants building greenfield natural gas pipelines do not have an existing customer base, they face greater risks constructing a new pipeline system and servicing new routes than established pipeline companies do when adding incremental capacity to their systems.[81]  With respect to developing rates for incremental expansion projects, the Commission's general policy is to use the ROE approved in the pipeline's last NGA section 4 rate proceeding or, if the pipeline has not filed a rate case, the ROE from the last litigated NGA section 4 rate

---

[78] Application, Ex. P, Schedule 2.  Mountain Valley's proposed cost of service includes an interruptible transportation revenue credit of $528,730.

[79] *Mountain Valley Pipeline, LLC*, Docket No. RP24-682-000 (May 17, 2024).

[80] *See, e.g.*, *Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043, at P 82 (2017), *order on reh'g*, 163 FERC ¶ 61,197, at P 53 (2018); *Adelphia Gateway, LLC*, 169 FERC ¶ 61,220, at P 63 (2019).

[81] *Mountain Valley Pipeline, LLC*, 163 FERC ¶ 61,197 at P 53; *Atl. Coast Pipeline, LLC*, 161 FERC ¶ 61,042, at P 102 (2017), *order on reh'g*, 164 FERC ¶ 61,100, at P 69 (2018); *Carlsbad Gateway, LLC*, 178 FERC ¶ 61,053, at P 20 (2022).

Docket No. CP25-60-000                                                      - 17 -

case.[82]  This tends to yield a return lower than 14%, reflecting the lower risk existing pipelines face when building incremental capacity.[83]

38.      The Commission previously approved Mountain Valley's request for a 14% ROE for the Southgate Project because at the time of the Certificate Order's issuance, Mountain Valley's Mainline System was not yet in service and did not have established operations or revenue streams.[84]  As a result, the Commission determined that the project faced a capital funding outlook similar to other greenfield pipeline systems.[85]  The Commission found its decision to be consistent with *Rockies Express Pipeline LLC* (*REX*), where the Commission approved a higher requested ROE of 13% for an expansion project that would connect to a previously authorized, but not fully operational greenfield pipeline, because of the greater risk associated with the project.[86]

39.      We find that circumstances have changed since the Certificate Order's issuance in 2020 such that a 14% ROE is no longer appropriate for the Southgate Project.  After Mountain Valley's Mainline System went into service in 2024,[87] it established operations and collected revenue from existing transportation services, thereby allowing it to show an existing revenue stream to attract investment.[88]  As a result, the Amendment Project no longer confronts the same level of risk as that faced by new market entrants not yet providing service.  We find that the Amendment Project is more like an existing pipeline expansion project than a greenfield project.[89]  Accordingly, *REX* is no longer analogous,

---

[82] *Cameron Interstate Pipeline, LLC*, 189 FERC ¶ 61,048, at P 17 (2024); *Adelphia Gateway, LLC*, 169 FERC ¶ 61,220 at P 65.

[83] *Mountain Valley Pipeline, LLC,* 163 FERC ¶ 61,197 at P 53 (citing *e.g.*, *Gas Transmission Nw., LLC*, 142 FERC ¶ 61,186, at P 18 (2013) (requiring use of 12.2% ROE from recent settlement, not the proposed 13.0%)).

[84] Certificate Order, 171 FERC ¶ 61,232 at P 57, Rehearing Order, 172 FERC ¶ 61,261 at P 14, *aff'd*, *Sierra Club v. FERC*, 38 F.4th at 232.

[85] Certificate Order, 171 FERC ¶ 61,232 at P 27; Rehearing Order, 172 FERC ¶ 61,261 at P 14.

[86] Rehearing Order, 172 FERC ¶ 61,261 at P 16 (citing *Rockies Express Pipeline LLC*, 116 FERC ¶ 61,272 (2006)); *see Sierra Club v. FERC*, 38 F.4th at 231-32.

[87] *Supra* note 7.

[88] Rehearing Order, 172 FERC ¶ 61,261 at P 16

[89] *See id.* P 15 (citing *Cheyenne Connector, LLC,* 168 FERC ¶ 61,180, at P 52

Docket No. CP25-60-000                                                          - 18 -

rather our decision here is consistent with other expansion projects with existing pipeline operations.[90]

40.     Because Mountain Valley has not yet litigated a rate case, we apply the last applicable litigated ROE, which is from *Panhandle E. Pipe Line Company, LP*, where the Commission adopted a ROE of 11.25 %.[91]  Therefore, we will require Mountain Valley to use a ROE of 11.25% for the Amendment Project and revise its rates accordingly.

### 3.    Fuel

41.     Mountain Valley explains that because the Amendment Project proposal has eliminated the Lambert Compressor Station, a retainage factor to cover fuel is no longer necessary.  Instead, Mountain Valley proposes to initially retain 0.05% of gas received onto the Southgate System for lost and unaccounted for gas.  Mountain Valley states that it will track the actual lost and unaccounted for gas to provide transportation service on the Amendment Project facilities, consistent with section 6.28 of the General Terms and Conditions of its tariff.  We approve Mountain Valley's revised fuel proposal.

### 4.    Reporting Incremental Costs

42.     Section 154.309 of the Commission's regulations includes bookkeeping and accounting requirements applicable to all expansions for which incremental rates are charged.  The requirements ensure that costs are properly allocated between pipelines' existing shippers and incremental expansion shippers.[92]  Therefore, we will continue to require Mountain Valley to keep separate books and accounting of costs and revenues attributable to the proposed services and capacity created by the Amendment Project, as required by section 154.309 of the Commission's regulations.[93]  The books should be

---

(2019)).

[90] *E.g.*, *Corpus Christi Liquefaction Stage III, LLC*, 169 FERC ¶ 61,135, at PP 34-35 (2019); *Cheyenne Connector, LLC*, 168 FERC ¶ 61,180 at PP 51-52; *Gulfstream Nat. Gas Sys., L.L.C.*, 170 FERC ¶ 61,199, at PP 18-19 (2020); *Carlsbad Gateway, LLC*, 178 FERC ¶ 61,053 at P 20.

[91] *Panhandle E. Pipe Line Co.*, Opinion No. 885, 181 FERC ¶ 61,211 (2022), *order on reh'g*, Opinion No. 885-A, 184 FERC ¶ 61,181 (2023), *order on reh'g*, Opinion No. 885-B, 186 FERC ¶ 61,015 (2024), *pets. for review filed sub nom. Panhandle E. Pipe Line Co. v. FERC*, No. 23-1220 (D.C. Cir.).

[92] 18 C.F.R. § 154.309 (2025).

[93] *Id.*

maintained with applicable cross-reference and the information must be in sufficient detail so that the data can be identified in Statements G, I, and J in any future NGA section 4 or 5 rate case, and the information must be provided consistent with Order No. 710.[94]

### 5.    Negotiated Rate Agreements

43.    Mountain Valley proposes to provide service to the shippers under negotiated rate agreements.  Mountain Valley must file either the negotiated rate agreements or tariff records setting forth the essential elements of the agreements in accordance with the Alternative Rate Policy Statement[95] and the Commission's negotiated rate policies.[96]

### 6.    *Pro Forma* Tariff Records

44.    Mountain Valley included in Exhibit P of its application revised *pro forma* tariff records reflecting the addition of the separate Southgate System rate zone, the inclusion of Rate Schedule EFT service, and other miscellaneous changes to reflect the addition of the Amendment Project.  We have reviewed Mountain Valley's *pro forma* tariff records and find that they are consistent with current Commission policy and direct Mountain Valley to file the tariff records before the Amendment Project's in-service date.

### C.    Environmental Impacts

45.    On May 22, 2025, the Commission issued a *Notice of Scoping Period Requesting Comments on Environmental Issues for the Proposed Mountain Valley Pipeline Southgate Amendment Project, and Notice of Public Scoping Session* (Notice of Scoping).  The Notice of Scoping was published in the *Federal Register*[97] and mailed to

---

[94] *See Revisions to Forms, Statements, & Reporting Requirements for Nat. Gas Pipelines,* Order No. 710, 122 FERC ¶ 61,262, at P 23 (2008).

[95] *Alts. to Traditional Cost-of-Serv. Ratemaking for Nat. Gas Pipelines; Regul. of Negotiated Transp. Servs. of Nat. Gas Pipelines* (Alternative Rate Policy Statement), 74 FERC ¶ 61,076, *reh'g and clarification denied*, 75 FERC ¶ 61,024, *reh'g denied*, 75 FERC ¶ 61,066 (1996), *aff'd sub nom. Burlington Reso. Oil & Gas Co. v. FERC*, 172 F.3d (D.C. Cir. 1998).

[96] *Nat. Gas Pipelines Negotiated Rate Policies & Pracs.; Modification of Negotiated Rate Pol'y*, 104 FERC ¶ 61,134 (2003), *order on reh'g and clarification*, 114 FERC ¶ 61,042, *reh'g dismissed and clarification denied*, 114 FERC ¶ 61,304 (2006).

[97] 90 Fed. Reg. 22719 (May 29, 2025).

Docket No. CP25-60-000                                                                      - 20 -

interested parties including federal, state, and local officials; agency representatives; environmental and public interest groups; Native American Tribes; local libraries and newspapers; and affected property owners.  In response to the Notice of Application and Notice of Scoping, the Commission received numerous filings from elected officials, state agencies, city governments, individuals, environmental and public interest groups/organizations, and companies.

46.     The primary issues raised during the scoping process included previous instances of non-compliance by Mountain Valley during construction of its Mainline System, impacts on water quality, environmental justice, sedimentation, impacts on vegetation, impacts on wildlife, air quality (including climate change), safety, and cumulative effects.

47.     Pursuant to the National Environmental Policy Act of 1969 (NEPA),[98] Commission staff prepared an EA for Mountain Valley's proposal, which was issued on October 3, 2025.[99]  The Notice of Availability of the EA established a 30-day comment period.  It was mailed to interested parties including federal, state, and local officials; agency representatives; environmental and public interest groups; Native American tribes; local libraries and newspapers; and affected property owners.  The EA was prepared with the cooperation of the U.S. Fish and Wildlife Service (FWS).  The analysis in the EA addresses geology; soils; water resources; wetlands; vegetation; fisheries; wildlife; special status, threatened, and endangered species; land use; visual resources; cultural resources; air quality; noise; reliability and safety; socioeconomics; cumulative effects, including climate change; and alternatives.  The EA addressed all environmental comments received during scoping and concluded that approval of the Amendment Project would not constitute a major federal action significantly affecting the quality of the human environment.[100]

---

[98] 42 U.S.C. §§ 4321 *et seq.*, *see also* 18 C.F.R. pt. 380 (2025) (Commission's regulations implementing NEPA).  The Council on Environmental Quality's (CEQ) final rule rescinding its NEPA regulations became effective on April 11, 2025.  90 Fed. Reg. 10610 (Feb. 25, 2025).

[99] For tracking purposes under NEPA, the unique identification number for documents relating to this environmental review is EAXX-019-20-000-1751374027.

[100] EA at 95.  Commission staff could not determine whether the effects from GHG emissions attributable to the project would be significant or insignificant.  *See* 42 U.S.C. § 4336(b)(2) ("An agency shall prepare an environmental assessment with respect to a proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown . . . .").  We note that NEPA does not require that the Commission formally label project-related GHG emissions as significant or insignificant.  *See Citizens*

48.    Under NEPA, the Commission considers impacts to all potentially affected communities.  Project activities that would affect local communities include construction and operation of natural gas pipeline outside of the previously certificated right-of-way at ten locations and construction and operation of two new interconnects (meter stations). Construction of the Amendment Project would affect about 59.3 acres of land outside the previously-certificated footprint, and operation of the Amendment Project would affect about 15.8 acres of land outside the previously-certificated footprint.[101]

49.    As described in the EA, the project's potential effects on local communities during construction include short-term visual effects, air effects, and noise effects, all of which would be temporary and less than significant.  The EA explains that visual effects would occur during construction due to the presence of construction equipment and the use of temporary workspace.[102]  With respect to construction-related air impacts, the EA describes mitigation measures to minimize fugitive dust.[103]  Finally, with respect to noise impacts from construction, the EA recommends, and this order requires, that Mountain Valley file mitigation measures to reduce nighttime noise levels associated with conventional bore operations to meet the Commission's sound level criterion.[104]

50.    The EA finds that operation of the Amendment Project would result in visual effects, air effects, and noise effects, all of which would be less than significant.  It explains that visual impacts from the aboveground facilities would be mitigated as existing vegetation would provide some screening.[105]  Regarding air impacts, the EA finds that operation of the project would not have significant impacts on local or regional air quality, describes monitoring requirements, and explains that the Amendment Project would have fewer emissions than the originally-certified project due to the elimination of

_Action Coal. of Ind., Inc. v. FERC_, 125 F.4th 229, 241-242 (D.C. Cir. 2025) (holding that "the absence of a 'significance' label does not violate NEPA, CEQ guidance, or FERC regulations") (citing _Food & Water Watch v. FERC_, 104 F.4th 336, 346 (D.C. Cir. 2024) (_East 300_)); _see also Transcon. Gas Pipe Line Co._, 187 FERC ¶ 61,200, at P 33 (2024) (applying _East 300_ in the context of an EA).

[101] EA at 7.

[102] _Id._ at 49-50

[103] _Id._ at 53.

[104] _Id._ at 56.

[105] _Id._ at 49-50.

Docket No. CP25-60-000                                                                - 22 -

the Lambert Compressor Station.[106]  As to noise impacts, the EA explains that noise associated with operation of the project would be below the Commission's sound level criterion.[107]

51.     The EA recommended implementation of Mountain Valley's proposed construction procedures and mitigation measures and Commission staff recommendations,[108] which we have adopted as conditions in the appendix of this order.

52.     The Commission received comments on the EA from Sierra Club, Appalachian Voices, Carly Diaz, Richard Vultaggio, Katherine Williams, Nancy Trevina, Georgia Haverty, Sam Collins, Jessica Simms, Claire Spear, Amminah Ghaffar-Fulp, Kate Ash-Vermillion, Our Children's Trust, Protect Our Water Heritage Rights, Duke Energy, PSNC, Appalachian Mountain Advocates, 7 Direction of Service, Joshua Vana, Carolinas Natural Gas Coalition, Rula, and Members of the Virginia General Assembly, and Mountain Valley.  We respond to comments on the EA below.

### 1.     Procedural Concerns

### a.     Preparation of an EIS and Reliance on the 2020 EIS

53.     Several commenters state that an Environmental Impact Statement (EIS), instead of an EA, should have been prepared for the project, in order to assess allegedly significant adverse effects, including those on local communities.[109]  NEPA requires a federal agency prepare an EIS if the proposed action has a reasonably foreseeable significant impact on the quality of the human environment.[110]  However, an agency may prepare an EA if the proposed action does not have a reasonably foreseeable significant effect on the quality of the human environment or if the significance of such effect is unknown.[111]  An agency's decision whether to prepare an EIS is left to agency discretion.[112]

---

[106] *Id.* at 53-54.

[107] *Id.* at 58-59.

[108] *Id.* at 95.

[109] *See, e.g.*, Sierra Club November 3, 2025 Comments at 2.

[110] 42 U.S.C. § 4336(b)(1).

[111] *Id.* § 4336(b)(2).

[112] *New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 477 (D.C. Cir. 2012); *see*

Docket No. CP25-60-000                                                          - 23 -

54.    Here, Commission staff prepared an EA to determine whether the project would have a significant impact on the human environment and thus require the preparation of an EIS.  The EA assessed the potential impacts of the project on a variety of resources, including impacts on land use, air quality, and noise, and determined that the construction and operation of the project would not constitute a major federal action significantly affecting the quality of the human environment. [113]  Accordingly, an EIS is not required.

55.    Several commenters state that the EA inappropriately relies on an out-of-date environmental analysis by relying on the 2020 final EIS prepared for the Southgate Project.[114]  Appalachian Mountain Advocates states that staff should have reassessed all of the impacts of the Amendment Project due to the climate crisis and should have revisited the conclusions of the 2020 final EIS.[115]

56.    The decision whether to complete a supplemental EIS is left to agency discretion under a "rule of reason" standard.[116]  Any new information brought to the attention of the Commission must be sufficient to show that the remaining federal action will affect the environment in a significant manner or to a significant extent not already

---

*also TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006) (explaining that an agency's evaluation of the consequences on the quality of the human environment is left to the judgment of the agency).

[113] EA at 95.

[114] *See, e.g.*, Carly Diaz October 27, 2025 Comments; Katherine Williams October 27, 2025 Comments; Nancy Trevino October 27, 2025 Comments; 7 Directions of Service November 3, 2025 Comments; and Appalachian Mountain Advocates November 3, 2025 Comments at 8-9.

[115] Appalachian Mountain Advocates November 3, 2025 Comments at 8-9.

[116] *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373 (1989); *Friends of the River v. FERC*, 720 F.2d 93, 109-10 (D.C. Cir. 1983); *see also Friends of Cap. Crescent Trail v. FTA*, 877 F.3d 1051, 1059 (D.C. Cir. 2017) (*Friends of Cap. Crescent Trail*) ("If an agency's decision not to prepare a [supplemental EIS] turns on a factual dispute the resolution of which implicated substantial agency expertise, the court defers to the agency's judgment.") (quoting Marsh, 490 U.S. at 376); *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. 168, 183 (2025) (*Seven Cnty.*) ("As the Court has emphasized on several occasions, and we doubly underscore again today, 'inherent in NEPA ... is a "rule of reason," which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process.'").

considered.[117]  In other words, a supplemental EIS "must only be prepared where new information provides a seriously different picture of the environmental landscape."[118] The Commission is afforded "substantial deference" regarding "the usefulness of any new potential information to the decisionmaking process."[119]

57.     The changes proposed by Mountain Valley will not cause significant increased impacts and, overall, the Amendment Project will result in fewer environmental impacts than the originally certificated project.[120]  The EA incorporates the 2020 final EIS and analyzes all changes and modifications to the original project, including components that would no longer be constructed, additional or new footprint, changes in construction methods or procedures, and additional effects identified through new resource surveys or new information.[121]  Thus, preparation of an EA was appropriate.  We also note that the limited scope of this proceeding is not an opportunity for parties to relitigate the original project or its environmental analysis.  NEPA is "not an authorization to undo what has already been done," nor does it "create a remedial scheme for past federal actions."[122]

**b.      Requests to Extend EA Comment Period**

58.     Several commenters argue that the EA comment period should have been extended to coincide with the comment periods for Transco's proposed Southeast Supply Enhancement Project and the Amendment Project's Clean Water Act Section 401

---

[117] *Marsh*, 490 U.S. at 374.

[118] *Stand Up for Cal. v. Dep't of the Interior*, 994 F.3d 616, 629 (D.C. Cir. 2021) (*Stand Up for Cal.*) (emphasis in original) (quoting *Friends of Cap. Crescent Trail*, 877 F.3d at 1060 (internal quotation marks omitted)); *see also Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 529 (9th Cir. 1994) (supplemental EIS not required to assess impact of fires when agency took requisite "hard look," relying on scientific expertise of two coordinating agencies who concluded no new significant impacts resulted); *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1439 (9th Cir. 1988) (agency decision not to supplement EIS in light of new information was reasonable where agency "carefully considered the information, evaluated its impact, and supported its decision not to supplement with a statement of explanation").

[119] *Seven Cnty.*, 605 U.S. at 181-83.

[120] EA at 95.

[121] *Id.* at 4.

[122] *Marysville Hydro Partners*, 62 FERC ¶ 61,011, at 61,037 (1993) (citing *Jones v. Lynn*, 477 F.2d 885, 890 (1st Cir. 1977)).

certification.[123]  Protect Our Water, Heritage, Rights contends that the public encountered difficulty understanding the overlapping proposals and timelines for the Amendment Project and the Southeast Supply Enhancement Project.[124]  The 30-day comment period is adequate and consistent with the Commission's standard practice for an EA, and we therefore find no reason to extend it.[125]  The Commission issued notices for the projects, in their respective dockets, as they were ready, and each notice clearly specified the relevant project and comment period.[126]  Accordingly, we do not find commenters have provided sufficient basis to extend the comment period on the EA.

### 2.    Comments on the EA

### a.    Soils and Prime Farmland

59.    Several commenters express concern that construction of the Amendment Project would negatively impact soils by causing upland erosion and compaction of soils, and thereby negatively affect vegetation, wildlife habitat, and farmland.[127]  As discussed in the EA, Mountain Valley would design and install best management practices (BMPs) in compliance with National Pollutant Discharge Elimination System (NPDES) permit requirements that would control soil erosion and sedimentation down-gradient of

---

[123] *See, e.g.*, Jessica Sims October 22, 2025 Comments; Joshua Vana November 3, 2025 Comments.

[124] Protect Our Water, Heritage, Rights November 3, 2025 Comments at 1-2.

[125] *See* FERC, Staff Guidance Manual on Implementation of NEPA at 8 (June 2025), https://www.ferc.gov/media/staff-guidance-manual-implementation-national-environmental-policy-act-june-2025 ("Where staff solicits comments on an environmental assessment, the comment period will be 30 days").

[126] Moreover, commenters could, and indeed did, comment on the effects of the proposed Southeast Supply Enhancement Project and the Amendment Project in this docket despite the EA comment period not being aligned.  *See, e.g.*, Joshua Vana November 3, 2025 Comments; 7 Directions of Service November 3, 2025 Comments. And the Commission considered the cumulative effects of the project, which included impacts from the Southeast Supply Enhancement Project.  *See* EA at 63-86.  In any event, we note that "[t]he Commission, like other agencies, is generally master of its own calendar and procedures." *Tallgrass Interstate Gas Transmission, LLC*, 154 FERC ¶ 61,277, at P 3 (2016) (citing *Stowers Oil & Gas Co.*, 27 FERC ¶ 61,001 (1984)).

[127] *See, e.g.*, Sierra Club November 3, 2025 Comments at 72 & 162; Appalachian Voices November 3, 2025 Comments at 41.

construction areas.[128]  Additionally, Mountain Valley's construction mitigation measures, are based in part on FERC's own *Upland Erosion Control, Revegetation and Maintenance Plan* (Plan) *and Wetland and Waterbody Construction and Mitigation Procedures* (Procedures), which have proven to be environmentally protective over the course of many years, hundreds of projects, and at locations across the United States.[129] Section 4.2.4 of the final EIS addresses soil compaction and states that Mountain Valley would decompact soil, which would benefit revegetation and thereby soil stability.[130] The EA states that, except where land would be permanently converted to industrial use, effects on soils would be temporary to short-term, lasting until revegetation is successful.[131]  We agree.

60.     Several commenters, including the Sierra Club, express concerns about farms and farmland.[132]  The EA examines the effect of the project on farmland and finds that only 1.2 acres of prime farmland would be converted to industrial use as a result of the Amendment Project,[133] which is a small fraction of the total acreage of prime farmland and farmland of statewide importance in the surrounding areas.[134]  The EA concludes that the Amendment Project's effects on the availability of prime farmland and farmland of statewide importance would not be significant.  We agree.

###       b.       Water Resources

61.     Several commenters express concerns that the Amendment Project would negatively impact the Dan River through hydrostatic testing water withdrawals and

---

[128] EA at 24.

[129] The FERC Plan and Procedures are a set of baseline construction and mitigation measures developed to minimize the potential environmental impacts of construction on upland areas, wetlands, and waterbodies.  They can be viewed on the Commission's website at http://www.ferc.gov/industries/gas/enviro/plan.pdf and http://www.ferc.gov/industries/gas/enviro/procedures.pdf.

[130] Final EIS at 4-24.

[131] EA at 17.

[132] Sierra Club November 3, 2025 Comments at 7.

[133] EA at 15.

[134] *Id.* at 17 (total acreage of prime farmland and farmland of statewide importance in Pittsylvania County, Virginia is 515,022 acres and in Rockingham County, North Carolina is 253,506 acres).

sedimentation during pipeline construction.[135]  As discussed in the EA, Mountain Valley would use several mitigation measures during the water withdrawal for hydrostatic testing, including using temporary, floating intake structures placed well above the river bottom; refraining from withdrawing water between May 15 to July 31 when Atlantic pigtoe glochidia are present in the water column; using intake screens with mesh less than 1.0 millimeter (in accordance with Virginia Department of Wildlife Resources recommendations); limiting intake velocity to less than 0.25 feet per second with a maximum capacity of 2,000 gallons per minute or approximately 4.5 cubic feet per second (cfs); and refraining from withdrawing more than ten percent of the river's flow at any time to avoid or minimize impacts on aquatic species (including listed species).[136] Additionally, Mountain Valley would cross the Dan River via horizontal directional drill, thus avoiding direct effects on that waterbody.[137]  Nevertheless, Mountain Vally would design and install BMPs in compliance with NPDES permit requirements to control soil erosion and sedimentation down-gradient of construction areas, and would restore construction areas and re-establish vegetation in order to prevent erosion and sedimentation into and along waterbodies.[138]  With these mitigation measures, the EA concluded, and we agree, that construction and operation of the project would not have significant effects on waterbodies.

62.      Multiple commenters state that trenchless construction methods would be less harmful to the environment and that the Commission has not taken this into consideration.[139]  The EA states that using trenchless crossing methods (such as the proposed horizontal directional drills [HDD] and conventional bores) greatly reduces potential effects on surface waterbodies, particularly compared to open-cut crossings.[140] As part of the Amendment Project, Mountain Valley proposed to change the previously certificated crossing method to a trenchless crossing method (conventional bore) for seventeen waterbodies.[141]  In considering whether to require a trenchless crossing, which

---

[135] *See, e.g.*, Carly Diaz October 27, 2025 Comments; Nancy Trevino October 27, 2025 Comments at 1.

[136] EA at 36 & Appendix A-4 at A-13.

[137] EA at 19.

[138] *Id.* at 24.

[139] *See, e.g.*, Carly Diaz October 27, 2025 Comments at 1; Appalachian Mountain Advocates November 3, 2025 Comments at 13-14.

[140] EA at 24.

[141] *Id.* at 22.

is more complex and costly and requires additional time and workspace than a trenched crossing, staff considers the significance of the impact that would be avoided. Here, on balance, Commission staff did not identify any additional streams for which a trenchless crossing technique was warranted. Moreover, we note that all waterbodies not crossed via trenchless methods would be crossed via dry-ditch crossing methods, which are more protective than wet open-cut crossings. The EA appropriately concludes that, with the proposed mitigation measures, the Amendment Project would not significantly affect surface water resources.[142]

63.     Multiple commenters express concern that construction of the Amendment Project would be disruptive to waterbodies and affect the drinking water of local communities.[143] Katherine Williams states that a lack of regulations would allow pollution of waterbodies to occur.[144] As stated above, Mountain Valley would design and install BMPs that control soil erosion and sedimentation down-gradient of construction areas and restore construction areas and re-establish vegetation in order to prevent erosion and sedimentation into and along waterbodies.[145] These steps would minimize impacts on surface waters. Moreover, we note that there are regulations applicable to pollution in waterbodies, and, as stated in the EA, Mountain Valley would be responsible for obtaining and complying with all permits and approvals required to construct and operate the Amendment Project.[146] And we note that as part of its certificate, Mountain Valley must file with the Secretary documentation that it has received all applicable authorizations required under Federal law (or evidence of waiver thereof) prior to commencing construction of the Southgate Project, as amended herein.[147] Additionally, the EA concludes that long-term and significant effects on groundwater are not anticipated as a result of the Amendment Project,[148] and the Amendment Project would not significantly affect surface water.[149] We agree.

---

[142] *Id.* at 24.

[143] *See, e.g.*, 7 Directions of Service November 3, 2025 Comments at 1.

[144] *See* Katherine Williams October 27, 2025 Comments at 1.

[145] EA at 24.

[146] *Id.* at 9.

[147] Certificate Order, 171 FERC ¶ 61,232 at env'tl cond. 10.

[148] EA at 19.

[149] *Id.* at 24.

Docket No. CP25-60-000                                                      - 29 -

64.    Regarding Appalachian Voices' argument that the EA fails to adequately analyze the impact of numerous waterbody crossings in close proximity to each other,[150] we note that the final EIS previously analyzed the waterbody crossings and that the EA assessed the impacts associated with the changes in waterbody crossings (i.e., fewer waterbody crossings overall and more trenchless waterbody crossings). As discussed in the final EIS, in-stream activities, such as open-cut pipeline crossing techniques, have the greatest potential to contribute to cumulative impacts on surface water resources through increased turbidity. However, these impacts are typically minor due to the short duration of in-water activities.[151]

### c.    Fisheries, Vegetation, and Wildlife

65.    Several commenters express concern about potential impacts on fish, fish spawning in the Dan River, vegetation, wildlife, including threatened and endangered species, and biodiversity.[152] Biodiversity (in the context of vegetation), wildlife, fisheries and aquatic species, and special status, threatened, and endangered species are all addressed in the EA[153] and the final EIS, which concluded that effects to these resources would be less than significant and that the Amendment Project is not likely to adversely affect listed species.[154] Additionally, as noted above, the Dan River would be crossed via HDD to avoid direct impacts on aquatic species and habitats. Regarding threatened and endangered species, Commission staff determined that the Amendment Project is not likely to adversely affect the listed northern long-eared bat, Atlantic pigtoe, and James spinnymussel.[155] On November 20, 2025, staff requested FWS's concurrence with these determinations. Environmental Condition 19 of the Certificate Order provides that Mountain Valley may not begin construction until the results of all outstanding biological surveys are filed, Commission staff completes Endangered Species Act consultation with the FWS, and Mountain Valley receives written notification from the Director of OEP or

---

[150] Appalachian Voices November 3, 2025 Comments at 20-21.

[151] Final EIS at 4-242 (explaining that turbidity plumes resulting from waterbody crossings disperse returning to background levels within days).

[152] *See, e.g.*, 7 Directions of Service November 3, 2025 Comments.

[153] EA at 27-41.

[154] Final EIS at 4-59 through 4-110.

[155] EA at 33-39. Commission staff also determined that the Amendment Project would not likely jeopardize the continued existence of the tricolored bat, green floater, and monarch butterfly.

designee that construction or use of mitigation may begin.[156]  The EA concludes that the Amendment Project would not significantly affect surface waters, including aquatic habitats, or wildlife.[157]  We agree.

66.    Some comments expressed concern regarding forests[158] and wilderness.[159]  The Amendment Project would not cross or impact wilderness areas.  With respect to forested land, as indicated in the EA, the Amendment Project affects substantially less forest than the originally certified project.[160]  The EA appropriately found, with implementation of Mountain Valley's construction and mitigation measures, the Amendment Project would not result in significant effects on vegetation, which includes forests.[161]

### d.    Air Quality

67.    Several commenters, including 7 Directions of Service, express concern about potential impacts on air quality.[162]  The EA finds that the effects of construction on air

---

[156] Environmental Condition 5 in the appendix of this order requires that Mountain Valley comply with all applicable environmental conditions from the Certificate Order, which includes Environmental Condition 19.

[157] EA at 24 & 32.  Regarding Appalachian Voices' claim that the EA should have considered the sedimentation report Mountain Valley included with its biological assessment, Appalachian Voices November 3, 2025 Comments at 19-20, we note that the report was provided at FWS's request and the information in the report does not alter staff's assessments or determinations in the EA.

[158] Sierra Club November 3, 2025 Comments at 2.

[159] *Id.*

[160] EA at 5 & 30 (Amendment Project would impact 374 less acres of forest than the originally certified project); *see also id.* at 31 (detailing that the construction footprint of the Amendment Project would cross approximately 13.8 acres of forested habitat not previously affected by the certified footprint and the operational footprint would permanently convert approximately 6.9 acres of forested habitat to non-forested habitat not previously affected by the certified footprint, which equates to a long-term decrease of 0.09 percent of forested habitat and permanent loss of 0.04 percent of the forested habitat within the Virginia Piedmont Forest Block Complex).

[161] *Id.* at 30.

[162] 7 Directions of Service November 3, 2025 Comments.

quality would be minor, temporary, and localized.[163]  The EA also finds that during operation the Amendment Project would not result in significant air quality impacts because of low emissions from the interconnects (meter stations) and pipeline segments.[164]  The  EA concludes that the Amendment Project would result in a decrease in operational emissions compared to the certified project.  We agree.

###   e.       Reliability and Safety

68.     Appalachian Voices asserts that the EA did not fully consider the proposed increase in pipeline diameter or the increase in natural gas capacity along with associated changes in blast zone and safety hazards.[165]  The EA includes updated information regarding the Amendment Project's potential impact radius.[166]  It explains that the Amendment Project facilities would be designed, constructed, operated, and maintained in accordance with the Department of Transportation Minimum Federal Safety Standards in 49 CFR Part 192 and other applicable federal and state regulations, and that with compliance with these requirements, the project would present a minimum risk to the public.[167]  We agree.

69.     One commenter expresses concern with pipeline companies using poor welds during construction.[168]  As stated in section 2.4.1.4 of the final EIS, welders must meet qualification standards per the Department of Transportation's regulations in 49 CFR 192 Subpart E, American Petroleum Standard 1104 (2025), and other requirements, and every completed weld would be examined by a welding inspector to determine its quality using radiographic or other approved methods as outlined in 49 CFR 192.[169]  Defective welds

---

[163] EA at 53.

[164] *Id.* at 54 (noting that the combined operational emissions for the Amendment Project would result in a reduction of 9.9 tons per year of VOC, 4.6 tons per year of total HAPs, and 122,910.6 tons of $CO_2e$ per year as compared to the originally certificated project).

[165] Appalachian Voices November 3, 2025 Comments at 2.

[166] EA at 62

[167] *Id.* at 60-62.

[168] *See* Katherine Williams October 27, 2025 Comments at 1.

[169] Final EIS at 2-19.

Docket No. CP25-60-000                                                                    - 32 -

would be repaired or replaced.  The completed pipeline would then be hydrostatically tested under pressure to detect leaks.

70.      Sierra Club expresses concern about pipeline thickness, automatic leak detection, automatic shutoff valves, and the use of dangerous chemicals.[170]  The safety of the pipeline is discussed in section B.10 of the EA,[171] and the pipeline would utilize remote control valves, which is unchanged from the originally certificated project, as analyzed in the final EIS.[172]

71.      Several commenters expressed concern regarding the collocation of the Amendment Project's pipeline with other pipelines.[173]  Collocation of proposed pipelines with existing or other proposed pipelines is common,[174] and generally decreases environmental impacts due to the minimization of new corridors.  Pipeline safety is discussed in section B.10 of the EA and section 4.12 of the final EIS.[175]  As noted in section A.4.2 of the EA, the proposed route was based on the previously-certificated project and modified in certain locations for engineering and environmental reasons.[176]

#### f.      **Cumulative Effects**

72.      Several commenters state that the EA does not contain a suitably thorough cumulative analysis of the Amendment Project, particularly as it relates to Transco's proposed Southeast Supply Enhancement Project.[177]  The 7 Directions of Service expresses concern regarding the cumulative effects on wetlands and waterbodies, such as the Dan River and its tributaries, from simultaneous construction of the two projects.[178]

---

[170] *See, e.g.*, Sierra Club November 3, 2025 Comments at 137 & 154.

[171] EA at 60.

[172] Mountain Valley February 3, 2025 Resource Report 11 at 11-7; *see* Final EIS at 4-213-219.

[173] *See, e.g.*, Sierra Club November 3, 2025 Comments at 152.

[174] EA at 62.

[175] *Id.* at 60 & Final EIS at 4-212.

[176] EA at 7.

[177] *See, e.g.*, Appalachian Voices November 3, 2025 Comments at 2.

[178] 7 Directions of Service November 3, 2025 Comments at 2.

The EA provides an analysis of cumulative effects of the Amendment Project when considered with other projects within the geographic scope, including the Southeast Supply Enhancement Project.[179]  As stated in the EA, the Amendment Project and the Southeast Supply Enhancement Project's overlapping timeline of anticipated construction and shared and adjacent workspaces would have the highest potential for cumulative effects.[180]

73.     Specifically, the EA found that Mountain Valley would minimize effects on wetlands by implementing the construction mitigation measures outlined in its Procedures and by adhering to applicable permit requirements.  Direct effects from construction projects involving clearing, grading, or excavation on sites larger than one acre would be required to obtain appropriate state NPDES stormwater construction permits, which would specify the types of erosion and sediment controls, BMPs, and conservation practices required.[181]  The EA found that with appropriate BMPs in place, effects on waterbodies and wetlands would be minimized, and concluded the Amendment Project's cumulative effects, including on wetlands and waterbodies, when considered with other projects would be less than significant.[182]  We find that the EA's cumulative analysis appropriately considered the project's cumulative effects.[183]

### g.     Climate Change

74.     Several commenters express concern regarding the contribution of the Amendment Project to global climate change.[184]  Appalachian Voices contends that the EA did not adequately assess air pollution, GHG emissions, and climate change.[185]  Specifically, Appalachian Voices argues that the GHG analysis should have considered the full 550,000 Dth/d associated with the Amendment Project instead of the additional

---

[179] EA at 63-86.

[180] *Id.* at 65.

[181] *Id.* at 70-71.

[182] *Id.* at 66-86, tbl. 16.

[183] *Seven Cnty.*, 605 U.S. at 183 ("we doubly underscore again today, 'inherent in NEPA . . . is a rule of reason, which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process'").

[184] *See, e.g.*, Sierra Club November 3, 2025 Comments at 12 & 359.

[185] Appalachian Voices November 3, 2025 Comments at 14.

250,000 Dth/d assessed in the EA.[186]  We disagree.   The final EIS for the certificated Southgate Project assessed the indirect effects from the downstream combustion of 300,000 Dth/d of subscribed capacity.[187]  "NEPA leaves 'substantial discretion to an agency to determine how best to gather and assess information' about a project's environmental impacts[;]"[188] agencies are "better equipped to assess what facts are relevant to [their] own decision."[189]  Accordingly, we have fulfilled our obligation under NEPA to consider and disclose the environmental impacts of the Amendment Project, which is relatively limited in scope, and the EA appropriately analyzed only impacts that differed from those already assessed in the final EIS.

75.    Our Children's Trust argues generally that the project will enable fossil fuel air pollution, threatening children's health and welfare.[190]  Our Children's Trust's comments raise general concerns about fossil fuel use, but do not raise any issues specific to the Amendment Project.  Accordingly, we find that Our Children's Trust's comments provide no information about the project at hand and are beyond the limited scope of this proceeding.  In any event, we note that that the combined operational emissions for the Amendment Project would result in a reduction in emissions.[191]

### h.    Alternatives

76.    Appalachian Mountain Advocates comments that the EA's stated purpose and need for the Amendment Project purpose was too narrow and thus impermissibly

---

[186] *Id.* at 11.

[187] Final EIS at 4-263.  We note that the final EIS was issued in 2020 and that subsequently, the Supreme Court has held that NEPA does not require the Commission to consider downstream GHG emissions from the end use of transported gas as those are effects over which the Commission does not exercise regulatory authority.  *Seven Cnty.*, 605 U.S. at 188-90 (2025) (explaining that "NEPA calls for the agency to focus on the environmental effects of the project itself;" and that agencies "are not required to analyze the effects of projects over which they do not exercise regulatory authority."); *see also E. Tenn. Nat. Gas, LLC*, 192 FERC ¶ 61,153, at PP 23, 28 (2025).

[188] *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1258 (10th Cir. 2019) (quoting *Biodiversity Conservation All. v. U.S. Forest Serv.*, 765 F.3d 1264, 1270 (10th Cir. 2014)).

[189] *Seven Cnty.*, 605 U.S. at 181.

[190] Our Children's Trust's November 3, 2025 Comments at 2.

[191] *See* EA at 54.

excluded reasonable alternatives.  Appalachian Mountain Advocates also argues that the Commission must consider whether the project is in the public convenience and necessity in light of the environmental gains associated with the Transco System Alternative.[192] Other commenters state the EA failed to consider a reasonable range of alternatives and request that the Commission conduct a thorough analysis of the No-Action Alternative.[193]

77.     Mountain Valley disputes Commission staff's conclusion in the EA that a Transco System Alternative, whereby Transco would modify its proposed Southeast Supply Enhancement Project to also accommodate the Amendment Project's capacity, would provide an environmental advantage over the Amendment Project, as a single pipeline instead of two separate and similar pipelines would significantly reduce environmental impacts.[194]  Mountain Valley alleges that the EA ignores that Mountain Valley already possesses a valid certificate for the Southgate Project.[195]

78.     NEPA provides that agencies include "a detailed statement" of "a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no-action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal.[196]  An agency uses the purpose and need statement to define the objectives of a proposed action and then to identify and consider reasonable alternatives.  When an agency is asked to consider a specific proposal, the needs and goals of the applicant should be taken into account.[197]  Where, as here, a federal agency is not the sponsor of a project, "the Federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project."[198]

---

[192] Appalachian Mountain Advocates November 3, 2025 Comments at 7.

[193] *See, e.g.*, Sierra Club November 3, 2025 Comments at 19.

[194] Mountain Valley November 3, 2025 Comments at 3-4; *see* EA at 92-94.

[195] EA at 5.

[196] 42 U.S.C. § 4332(c)(iii); *see Seven Cnty.*, 605 U.S. at 181-82 (explaining that agencies are entitled to substantial deference in assessing alternatives, including what alternatives qualify as feasible.")

[197] *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991); *Transcon. Gas Pipe Line Co.*, 186 FERC ¶ 61,047, at P 48 (2024).

[198] *See e.g.*, *City of Grapevine, Tex. v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d at 199 (explaining that

79.     The EA included an assessment of the No-Action Alternative and the Transco System Alternative.[199]  The EA did not consider route alternatives because neither stakeholders nor staff identified any that would be reasonable and preferrable to the proposed action while meeting the project objective.[200]  Under the No-Action Alternative, although none of the impacts associated with the Amendment Project would occur, the Amendment Project objectives would not be met.  However, the certificated Southgate Project, as described in the final EIS, would remain authorized and Mountain Valley could choose to proceed with that version of the project.  Regarding the system alternative, the EA finds that the Amendment Project would result in fewer environmental impacts than the originally certificated project,[201] and notes that the Commission will assess the viability and appropriateness of the Transco System Alternative based on consideration of non-environmental aspects of the project objectives along with environmental factors.[202]  As discussed, the project is needed, and we find this need outweighs the environmental benefits associated with the System Alternative.[203]

### i.     Mountain Valley's Compliance Record

80.     Some commenters point to a series of violations documented by Virginia Department of Environmental Quality (Virginia DEQ) and West Virginia Department of Environmental Protection (West Virginia DEP) due to issues with erosion control and runoff at project construction sites for Mountain Valley's Mainline System.[204]

81.     First, we note that the United States Court of Appeals for the District of Columbia Circuit previously found that the Commission appropriately distinguished the mitigation measures for erosion and runoff for the Southgate Project from those that failed for the

---

the evaluation of alternatives is "shaped by the application at issue and by the function that the agency plays in the decisional process").

[199] EA at 91-95.

[200] EA at 91.

[201] *Id.* at 5.

[202] *Id.* at 93-94.

[203] *See supra* PP 27-30.

[204] *See, e.g.*, Carly Diaz October 27, 2025 Comments; Katherine Williams October 27, 2025 Comments; Nancy Trevino October 27, 2025 Comments; Georgia Haverty October 29, 2025 Comments.

Mainline System.[205]  The court accepted the Commission's explanation that the 2018 precipitation levels that caused erosion and sedimentation issues during construction of the Mainline System are not expected to repeat, but if they should, that erosion would be limited because the Southgate Project traverses flatter terrain than the Mainline System and Mountain Valley would implement additional weather monitoring and other measures.[206]

82.     Additionally, staff's review found that most of the violations that occurred during construction of the Mainline System did not result in resource impacts.[207]  Additionally, Mountain Valley reached consent decrees with both Virginia DEP and West Virginia DEP to resolve violations of state environmental standards and regulations, and no additional action by the Commission is necessary.[208]  Moreover, we note that Virginia DEQ is currently considering a water quality certification for the Amended Project and will be able to take into account any concerns about past violations.

### j.      **Bonds**

83.     As noted in the EA, Mountain Valley will obtain all necessary permits for public road crossings or work within public road rights-of-way, including required road bonds necessary for construction vehicle usage and permits from Virginia Department of Transportation and North Carolina Department of Transportation.[209]  One commenter states that the bonds would be insufficient to reimburse the community for any damages caused by the project.[210]  The Commission does not require bonds because the

---

[205] Sierra Club v. FERC, 38 F.4th at 232-33.

[206] *Id.*

[207] Virginia DEQ, the state agency with water quality oversight under the Clean Water Act, found that:  "[t]he majority of these violations did not result in any impact on water quality or the environment and that …  A number were paperwork violations, such as failing to keep a daily log of project activities related to environmental permit compliance and corrective measures implementation."  U.S. Department of Agriculture, Final Supplemental EIS, Docket No. CP16-10-000, at 47 (filed April 17, 2023)

[208] *See Mountain Valley Pipeline, LLC*, 179 FERC ¶ 61,013, at P 133 (2022).

[209] EA at Table 3.

[210] Katherine Williams October 27, 2025 Comments at 1.

Commission has the authority to require restoration and remediation of construction impacts to satisfactory levels.[211]

###### k.    Shipment of Natural Gas Overseas

84.    One commenter states that gas from the Amendment Project would be shipped overseas.[212]  Sierra Club states that the project would not benefit American citizens who live nearby.[213]  As explained in the EA, the Amendment Project's delivery locations would be in North Carolina and the export of natural gas is not proposed.[214]  However, as noted above, the Commission does not regulate or track how shippers decide to flow natural gas downstream.

###### l.    Environmental Analysis Conclusion

85.    We have reviewed the information and analysis contained in the EA, as well as the other information in the record, regarding potential environmental effects of the Amendment Project.  We accept the environmental recommendations in the EA, and include them as conditions in an appendix to this order.  Based on the analysis in the EA, as supplemented or clarified herein,[215] we conclude that if constructed and operated in accordance with Mountain Valley's application and supplements, and in compliance with the environmental conditions in the appendix to this order our approval of this proposal would not constitute a major federal action significantly affecting the quality of the human environment.[216]

86.    Compliance with the environmental conditions appended to our orders is integral to ensuring that the environmental effects of approved projects are consistent with those anticipated by our environmental analyses.  Thus, Commission staff carefully reviews all information submitted.  Only when satisfied that the applicant has complied with all

---

[211] *See Transcon. Gas Pipe Line Co., LLC*, 154 FERC ¶ 61,166, at P 63 (2016).

[212] Katherine Williams October 27, 2025 Comments at 1.

[213] *See, e.g.*, Sierra Club November 3, 2025 Comments at 136.

[214] EA at 2.

[215] Although the analysis in the EA provides substantial evidence for our conclusions in this order, it is the order itself that serves as our record of decision.  The order supersedes any inconsistent discussion in the EA.

[216] We are not making a significance determination regarding GHG effects for the reasons discussed above.  *Supra* note 100.

applicable conditions will a notice to proceed with the activity to which the conditions are relevant be issued.  We also note that the Commission has the authority to take whatever steps are necessary to ensure the protection of environmental resources during construction and operation of the Amendment Project, including authority to impose any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the order, as well as the avoidance or mitigation of unforeseen adverse environmental effects resulting from Amendment Project construction and operation.

### D.      Conclusion

87.     We find that Mountain Valley has demonstrated a need for the Southgate Amendment Project, which will provide 550,000 Dth/d of firm transportation service. Further, the project will not have adverse impacts on Mountain Valley's existing shippers or other pipelines and their existing customers, and the project's benefits will outweigh any adverse economic effects on landowners and surrounding communities.  The Commission recognizes that the proposed project would impact the environment and individuals living in the vicinity of the project facilities, but that the project impacts, as mitigated, would not be significant.  Based on the discussion above, we conclude that, under section 7 of the NGA, the public convenience and necessity requires approval of the Southgate Amendment Project, subject to the conditions in this order.

88.     Any state or local permits issued with respect to the jurisdictional facilities authorized herein must be consistent with the conditions of this certificate.  The Commission encourages cooperation between interstate pipelines and local authorities. This does not mean, however, that state and local agencies, through application of state or local laws, may prohibit or unreasonably delay the construction or operation of facilities approved by this Commission.[217]

89.     The Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application, as supplemented, and exhibits thereto, and all comments, and upon consideration of the record.

---

[217] *See* 15 U.S.C. § 717r(d) (state or federal agency's failure to act on a permit considered to be inconsistent with Federal law); *see also Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988) (state regulation that interferes with FERC's regulatory authority over the transportation of natural gas is preempted); *Dominion Transmission, Inc. v. Summers,* 723 F.3d 238, 245 (D.C. Cir. 2013) (noting that state and local regulation is preempted by the NGA to the extent it conflicts with federal regulation, or would delay the construction and operation of facilities approved by the Commission).

The Commission orders:

(A)    The Certificate Order issued in Docket No. CP19-14-000 is amended, as described and conditioned herein, and as more fully described in the application and subsequent filings by the applicant, including any commitments made therein.

(B)    The certificate authority issued in Ordering Paragraph (A) is conditioned on Mountain Valley:

        (1)  completing construction of the proposed facilities and making them available for service within two years of the date of this order pursuant to section 157.20(b) of the Commission's regulations;

        (2)  complying with all applicable Commission regulations under the NGA including, but not limited to, Parts 154, 157, and 284, and paragraphs (a), (c), (e), and (f) of section 157.20 of the Commission's regulations;

        (3)  complying with the environmental conditions listed in the appendix to this order; and

        (4)  filing a written statement affirming that it has executed firm contracts for of the capacity levels and terms of service represented in its filed precedent agreements, prior to commencing construction.

(C)    Mountain Valley's revised proposed rates for service on the Amendment Project are approved, subject to the conditions described above.

(D)    Mountain Valley's proposal to charge an initial retainage factor to recover lost and unaccounted for gas costs associated with the Southgate System is approved.

(E)    Mountain Valley shall notify the Commission's environmental staff by telephone or e-mail of any environmental noncompliance identified by other federal, state, or local agencies on the same day that such agency notifies Mountain Valley. Mountain Valley shall file written confirmation of such notification with the Secretary of the Commission within 24 hours.

Docket No. CP25-60-000                                      - 41 -

(F)     The November 21, 2025 and December 16, 2025 motions to lodge are denied, and the November 21, 2025 protest is rejected, as described in the body of this order.

By the Commission.

( S E A L )

Carlos D. Clay,
Deputy Secretary.

**Appendix**
**Environmental Conditions**

As recommended in the Environmental Assessment (EA), this authorization includes the following conditions:

1.      Mountain Valley shall follow the construction procedures and mitigation measures described in its amendment application and supplements (including responses to staff data requests) and as identified in the EA, unless modified by the Order. Mountain Valley must:

   a.   request any modification to these procedures, measures, or conditions in a filing with the Secretary of the Commission (Secretary);
   b.   justify each modification relative to site-specific conditions;
   c.   explain how that modification provides an equal or greater level of environmental protection than the original measure; and
   d.   receive approval in writing from the Director of Office of Energy Projects (OEP), or the Director's designee, **before using that modification**.

2.      The Director of OEP, or the Director's designee, has delegated authority to address any requests for approvals or authorizations necessary to carry out the conditions of the Order, and take whatever steps are necessary to ensure the protection of environmental resources during construction of the Amendment Project.  This authority shall allow:

   a.   the modification of conditions of the Order;
   b.   stop-work authority; and
   c.   the imposition of any additional measures deemed necessary to ensure continued compliance with the intent of the conditions of the Order as well as the avoidance or mitigation of unforeseen adverse environmental effects resulting from Amendment Project construction and operation.

3.      The authorized facility locations shall be as shown in the EA, as supplemented by filed alignment sheets.  **As soon as they are available, and before the start of construction**, Mountain Valley shall file with the Secretary any revised detailed survey alignment maps/sheets at a scale not smaller than 1:6,000 with station positions for all facilities approved by the Order.  All requests for modifications of environmental conditions of the Order or site-specific clearances must be written and must reference locations designated on these alignment maps/sheets. Mountain Valley's exercise of eminent domain authority granted under Natural Gas Act (NGA) section 7(h) in any condemnation proceedings related to the Order must be consistent with these authorized facilities and locations.  Mountain

Valley's right of eminent domain granted under NGA section 7(h) does not authorize it to increase the size of its natural gas pipeline or facilities to accommodate future needs or to acquire a right-of-way for a pipeline to transport a commodity other than natural gas.

4. **Within 5 days of receipt of a water quality certification issued by the Virginia Department of Environmental Quality (VADEQ) and the North Carolina Department of Environmental Quality (NCDEQ)**, Mountain Valley shall file the complete certification, including all conditions. All conditions attached to the water quality certification constitute mandatory conditions of the Certificate Order. **Prior to construction**, Mountain Valley shall file, for review and written approval of the Director of OEP, or the Director's designee, any revisions to its project design necessary to comply with the water quality certification conditions.

5. Mountain Valley shall comply with all applicable environmental conditions in the Appendix of the Commission's June 18, 2020, Order for the Southgate Project in Docket No. CP19-14-000.

6. **Prior to construction**, Mountain Valley shall file with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, its updated Erosion and Sediment Control (E&SC) Plan.

7. **Prior to construction**, Mountain Valley shall file with the Secretary, correspondence from the applicable state agencies regarding whether they approve the installation of slope breakers across the full width of the construction right-of-way.

8. **Prior to construction**, Mountain Valley shall file with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, an updated *Mountain Valley Southgate Pipeline Stream Burial Recommendations*. The revised document shall resolve all discrepancies with the waterbody crossing table, utilize Mountain Valley's waterbody identifications (IDs), and clarify whether Mountain Valley would implement Geosyntec's recommendations.

9. **Prior to construction**, Mountain Valley shall file with the Secretary, for review and written approval by the Director of OEP, or the Director's designee, mitigation measures to reduce nighttime noise levels at all 24-hour conventional bores to less than 48.6 dBA equivalent sound level (Leq). Mountain Valley shall also revise its Nighttime Construction Noise Mitigation Plan to include all 24-hour conventional bore locations.

10. Mountain Valley shall file a noise survey with the Secretary **no later than 60 days** after placing the Dan River Interconnect #1 and the Dan River Interconnect #2

Docket No. CP25-60-000                                                  - 44 -

into service.  If a full flow rate noise survey at the station's maximum design capacity is not possible, Mountain Valley shall provide an interim survey at the maximum possible flow rate and provide the full flow rate survey **within 6 months**.  If the noise attributable to the operation of the Dan River Interconnects #1 and #2 exceeds a day-night sound level of 55 dBA at any nearby noise sensitive area, Mountain Valley shall file a report on what changes are needed and shall install additional noise controls to meet the level **within 1 year** of the in-service date.  Mountain Valley shall confirm compliance with this requirement by filing a second noise survey with the Secretary **no later than 60 days** after it installs the additional noise controls.

# Exhibit B

Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, *Mountain Valley Pipeline, LLC*, Dkt. No. CP25-60-001, 194 FERC ¶ 62,087 (Feb. 20, 2026)

194 FERC ¶ 62,087
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Mountain Valley Pipeline, LLC                    Docket No. CP25-60-001

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(February 20, 2026)

        Rehearing has been timely requested of the Commission's order issued on
December 18, 2025, in this proceeding.  *Mountain Valley Pipeline, LLC*, 193 FERC
¶ 61,222 (2025).  In the absence of Commission action on a request for rehearing within
30 days from the date it is filed, the request for rehearing may be deemed to have been
denied.  15 U.S.C. § 717r(a); 18 C.F.R. § 385.713 (2025); *Allegheny Def. Project v.
FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

        As provided in 15 U.S.C. § 717r(a), the request for rehearing of the above-cited
order filed in this proceeding will be addressed in a future order to be issued consistent
with the requirements of such section.  As also provided in 15 U.S.C. § 717r(a), the
Commission may modify or set aside its above-cited order, in whole or in part, in such
manner as it shall deem proper.

                                    Debbie-Anne A. Reese,
                                    Secretary.

# Exhibit C

Official Service List in Federal Energy Regulatory Commission
Dkt. Nos. CP25-60-000 and CP25-60-001

# Service List for CP25-60-000 Mountain Valley Pipeline, LLC

| Party | Primary Person or Counsel of Record to be Served | Other Contact to be Served |
|---|---|---|
| Kellie Ferguson | Kellie Ferguson<br>Ms. Kellie Ferguson<br>1244 Wolf Creek Rd<br>Narrows, VIRGINIA 24124<br>UNITED STATES<br>kellieferguson11@gmail.com | |
| Andrew Hinz | Andrew Hinz<br>1427 PARK AVE<br>BALTIMORE, MARYLAND 21217<br>UNITED STATES<br>ahinz61@outlook.com | |
| Crystal Cavalier | Crystal Cavalier<br>5123 N NC HIGHWAY 119<br>MEBANE, NORTH CAROLINA 27302<br>UNITED STATES<br>crystal@7directionsofservice.com | |
| Aminah Ghaffar | Aminah Ghaffar<br>110 Margaret Dr<br>Creedmoor, NORTH CAROLINA 27522<br>UNITED STATES<br>aminah@7directionsofservice.com | |
| Seth Harris | Seth Harris<br>PO Box 1265<br>Taylorsville, NORTH CAROLINA 28681<br>UNITED STATES<br>newriverindians@gmail.com | |
| American Gas Association | Matthew Agen<br>Chief Reg. Counsel, Energy<br>American Gas Association<br>400 N. Capitol Street, NW<br>WASHINGTON, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>magen@aga.org | Katherine Herrera<br>Senior Regulatory Policy Analy<br>American Gas Association<br>400 N. Capitol Street, NW<br>Washington, DISTRICT OF COLUMBIA 20001<br>kherrera@aga.org |

| | | |
|---|---|---|
| Appalachian Mountain Advocates | Benjamin Luckett<br>Senior Attorney<br>Appalachian Mountain Advocates<br>PO Box 507<br>Lewisburg, WEST VIRGINIA 24901<br>UNITED STATES<br>bluckett@appalmad.org | |
| Blue Ridge Environmental Defense League | Benjamin Luckett<br>Senior Attorney<br>Appalachian Mountain Advocates<br>PO Box 507<br>Lewisburg, WEST VIRGINIA 24901<br>UNITED STATES<br>bluckett@appalmad.org | |
| Center for Biological Diversity | Benjamin Luckett<br>Senior Attorney<br>Appalachian Mountain Advocates<br>PO Box 507<br>Lewisburg, WEST VIRGINIA 24901<br>UNITED STATES<br>bluckett@appalmad.org | Jason Rylander<br>Senior Attorney<br>1411 K ST NW STE 1300<br>WASHINGTON, DISTRICT OF COLUMBIA 20005<br>jrylander@biologicaldiversity.org |
| Center for LNG | Intervenor NGSA<br>NATURAL GAS SUPPLY ASSOCIATION<br>900 17th Street NW<br>Suite 500<br>Washington, DISTRICT OF COLUMBIA 20002<br>UNITED STATES<br>intervenor@ngsa.org | |
| Chesapeake Climate Action Network | Benjamin Luckett<br>Senior Attorney<br>Appalachian Mountain Advocates<br>PO Box 507<br>Lewisburg, WEST VIRGINIA 24901<br>UNITED STATES<br>bluckett@appalmad.org | |
| Duke Energy Carolinas, LLC | William Simmerson<br>Associate General Counsel<br>Duke Energy Corporation | Brian S. Heslin<br>Deputy General Counsel<br>Duke Energy Corporation |

| | | |
|---|---|---|
| | 411 Fayetteville Street<br>Raleigh, NORTH CAROLINA 27601<br>UNITED STATES<br>william.simmerson@duke-energy.com | 550 S. Tryon St.<br>(DEC45A)<br>Charlotte, NORTH CAROLINA 28202<br>brian.heslin@duke-energy.com |
| Duke Energy Carolinas, LLC | | Lee Mitchell<br>Duke Energy Business Services, LLC<br>526 S CHURCH ST<br>EC02F<br>CHARLOTTE, NORTH CAROLINA 28202<br>lee.mitchell@duke-energy.com |
| Duke Energy Progress, LLC | William Simmerson<br>Associate General Counsel<br>Duke Energy Corporation<br>411 Fayetteville Street<br>Raleigh, NORTH CAROLINA 27601<br>UNITED STATES<br>william.simmerson@duke-energy.com | Brian S. Heslin<br>Deputy General Counsel<br>Duke Energy Corporation<br>550 S. Tryon St.<br>(DEC45A)<br>Charlotte, NORTH CAROLINA 28202<br>brian.heslin@duke-energy.com |
| Duke Energy Progress, LLC | | Lee Mitchell<br>Duke Energy Business Services, LLC<br>526 S CHURCH ST<br>EC02F<br>CHARLOTTE, NORTH CAROLINA 28202<br>lee.mitchell@duke-energy.com |
| Mountain Valley Pipeline, LLC | Jennifer Brough<br>Partner<br>Sheppard Mullin Richter & Hampton LLP<br>Four Embarcadero Center<br>17th Floor<br>San Francisco, CALIFORNIA 94111-4109<br>UNITED STATES<br>JBrough@sheppard.com | William Lavarco<br>Senior FERC Counsel<br>NextEra Energy Companies<br>801 Pennsylvania Ave., NW<br>Suite 220<br>Washington, DISTRICT OF COLUMBIA 20004<br>william.lavarco@nee.com |
| NATURAL GAS SUPPLY | Intervenor NGSA<br>NATURAL GAS SUPPLY ASSOCIATION | |

| | | |
|---|---|---|
| ASSOCIATION (DC) | 900 17th Street NW<br>Suite 500<br>Washington, DISTRICT OF COLUMBIA 20002<br>UNITED STATES<br>intervenor@ngsa.org | |
| Natural Resources Defense Council | Caroline Reiser<br>Senior Staff Attorney<br>Natural Resources Defense Council<br>1152 15th Street, NW<br>Suite 300<br>Washington, DISTRICT OF COLUMBIA 20005<br>UNITED STATES<br>creiser@nrdc.org | |
| Piedmont Natural Gas Company, Inc. | Molly Suda<br>Associate General Counsel<br>Duke Energy Corporation<br>1301 PENNSYLVANIA AVE NW STE 200<br>WASHINGTON, DISTRICT OF COLUMBIA 20004<br>UNITED STATES<br>molly.suda@duke-energy.com | |
| Protect Our Water, Heritage, Rights | Russell Chisholm<br>2395 Clover Hollow Rd<br>Newport, VIRGINIA 24128<br>UNITED STATES<br>russell.powhr@gmail.com | |
| PUBLIC CITIZEN, INC | Tyson Slocum<br>Energy Program Director<br>PUBLIC CITIZEN, INC<br>215 PENNSYLVANIA AVE SE<br>WASHINGTON, DISTRICT OF COLUMBIA 20003<br>UNITED STATES<br>tslocum@citizen.org | |
| Public Service Company of North Carolina, Inc. | Daniel Archuleta<br>Partner<br>Troutman Pepper Locke LLP<br>401 9TH ST NW STE 1000<br>WASHINGTON, DISTRICT OF COLUMBIA 20004 | Benjamin Duwve<br>Associate<br>Troutman Pepper Locke LLP<br>401 9TH ST NW<br>WASHINGTON, DISTRICT OF |

| | UNITED STATES<br>daniel.archuleta@troutman.com | COLUMBIA 20004<br>Benjamin.Duwve@troutman.com |
|---|---|---|
| Public Service Company of North Carolina, Inc. | | Rose M. Jackson<br>Director- U.S. Gas Supply<br>Public Service Company of North Carolina, Incorporated d/b/a Enbridge Gas North Carolina<br>220 Operation Way<br>MC- J66<br>Cayce, SOUTH CAROLINA 29033<br>rose.jackson@enbridge.com |
| Public Service Company of North Carolina, Inc. | | Braxton Craig Collins<br>Senior Legal Counsel<br>Public Service Company of North Carolina, Incorporated<br>220 OPERATION WAY<br>MAIL CODE OSCC-1A<br>CAYCE, SOUTH CAROLINA 29033<br>craig.collins@enbridge.com |
| Public Service Company of North Carolina, Inc. | | J. Darrin Kahl<br>Manager, Gas Suipply<br>Dominion Energy Services, Inc.<br>601 OLD TAYLOR RD<br>CAYCE, SOUTH CAROLINA 29033<br>darrin.kahl@dominionenergy.com |
| Sierra Club | Benjamin Luckett<br>Senior Attorney<br>Appalachian Mountain Advocates<br>PO Box 507<br>Lewisburg, WEST VIRGINIA 24901<br>UNITED STATES<br>bluckett@appalmad.org | |
| Southern Environmental Law Center | Mark Sabath<br>Southern Environmental Law Center<br>500 NEW JERSEY AVE NW STE 600<br>WASHINGTON, DISTRICT OF COLUMBIA 20001 | Maggie Shober<br>Southern Alliance for Clean Energy<br>PO Box 1842<br>Knoxville, TENNESSEE 37901<br>maggie@cleanenergy.org |

| | | |
|---|---|---|
| | UNITED STATES<br>msabath@selc.org | |
| Southern Environmental Law Center | Megan Gibson<br>Southern Environmental Law Center<br>500 New Jersey Ave. NW, Suite 600<br>Washington, DISTRICT OF COLUMBIA 20001<br>UNITED STATES<br>mgibson@selc.org | Shelley Robbins<br>Senior Decarbonization Manager<br>4231 AMERICAN DR APT B<br>DURHAM, NORTH CAROLINA 27705<br>shelley@cleanenergy.org |
| Southern Environmental Law Center | | Crystal A Cavalier<br>5123 N NC HIGHWAY 119<br>MEBANE, NORTH CAROLINA 27302<br>crystal@7directionsofservice.com |
| Southern Environmental Law Center | | Katie Whitehead<br>PO BOX 947<br>CHATHAM, VIRGINIA 24531<br>mkwhitehead@yahoo.com |
| Southern Environmental Law Center | | Robert McNutt<br>301 DUNHILL DR<br>DURHAM, NORTH CAROLINA 27713<br>rwmcnutt@mindspring.com |
| Terry Family | John Terry<br>Terry Family<br>8741 Poor Mt Rd<br>Bent Mountain, VIRGINIA 24059<br>UNITED STATES<br>coles.terry3@gmail.com | Grace M Terry<br>Terry Family<br>4718 WEMBLEY PL SW<br>ROANOKE, VIRGINIA 24018<br>graceforpreservation@gmail.com |
| Terry Family | elizabeth reynolds<br>Terry Family<br>934 Stonegate Drive<br>Salem, VIRGINIA 24153<br>UNITED STATES<br>elizabethrsalem@aol.com | Frank H Terry, JR<br>Terry Family<br>8815 Poor Mt Rd<br>Bent Mountain, VIRGINIA 24059<br>frankt9688@aol.com |
| Transcontinental Gas Pipe Line Company, LLC | Francesca Ciliberti<br>Senior Counsel<br>Transcontinental Gas Pipe Line Company, LLC<br>2800 Post Oak Blvd<br>Houston, TEXAS 77056 | Stephen Andrew Hatridge, ESQ<br>VP & Assistant General Counsel<br>Transcontinental Gas Pipe Line Company, LLC<br>2800 Post Oak Blvd<br>P.O. Box 1396 |

| | UNITED STATES<br>francesca.ciliberti-ayres@williams.com | Houston, TEXAS 77056<br>stephen.a.hatridge@williams.com |
|---|---|---|
| Transcontinental Gas Pipe Line Company, LLC | Andre Pereira<br>Manager, Cert., Modernization<br>Transcontinental Gas Pipe Line Company, LLC<br>2800 Post Oak Blvd<br>Houston, TEXAS 77056<br>UNITED STATES<br>andre.s.pereira@williams.com | |
| Wild Virginia | Benjamin Luckett<br>Senior Attorney<br>Appalachian Mountain Advocates<br>PO Box 507<br>Lewisburg, WEST VIRGINIA 24901<br>UNITED STATES<br>bluckett@appalmad.org | |

SOUTHERN ALLIANCE FOR
CLEAN ENERGY, 7 DIRECTIONS OF
SERVICE, APPALACHIAN VOICES,
BLUE RIDGE ENVIRONMENTAL
DEFENSE LEAGUE, CHESAPEAKE
CLIMATE ACTION NETWORK,
SIERRA CLUB, and WILD VIRGINIA,

          *Petitioners*,

      v.

FEDERAL ENERGY REGULATORY
COMMISSION,

          *Respondent*.

No. _____

**CORPORATE DISCLOSURE STATEMENT**

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure

and D.C. Circuit Rule 26.1, Petitioners make the following disclosures:

**Southern Alliance for Clean Energy ("SACE")** is a regional non-profit

committed to promoting responsible and equitable energy choices to ensure clean,

safe, and healthy communities throughout the Southeast. SACE has no parent

companies, and no publicly held company has a 10% or greater ownership interest

in SACE.

**7 Directions of Service ("7 Directions")** is an Indigenous-led environmental justice and community organizing collective based on Occaneechi-Saponi homelands in rural North Carolina. 7 Directions has no parent companies, and no publicly held company has a 10% or greater ownership interest in 7 Directions.

**Appalachian Voices** works in partnership with local people and communities to defend the natural heritage and economic future of the Appalachian region. Appalachian Voices has no parent companies, and no publicly held company has a 10% or greater ownership interest in Appalachian Voices.

**Blue Ridge Environmental Defense League ("BREDL")** is a regional, community-based environmental organization founded to serve the principles of earth stewardship, environmental democracy, social justice, and community empowerment. BREDL has no parent companies, and no publicly held company has a 10% or greater ownership interest in BREDL.

**Chesapeake Climate Action Network ("CCAN")** is a grassroots, nonprofit organization dedicated to fighting climate change and all of the harms fossil-fuel infrastructure causes in Maryland, Virginia, and Washington, D.C. CCAN has no parent companies, and no publicly held company has a 10% or greater ownership interest in CCAN.

**Sierra Club**, a corporation organized and existing under the laws of the State of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment. Sierra Club has no parent companies, and no publicly held company has a 10% or greater ownership interest in Sierra Club.

**Wild Virginia** is a statewide organization that works to preserve and support the complexity, diversity and stability of natural ecosystems by enhancing connectivity, water quality and climate in the forests, mountains, and waters of Virginia. Wild Virginia has no parent companies, and no publicly held company has a 10% or greater ownership interest in Wild Virginia.

DATED: March 31, 2026                          Respectfully submitted,


*/s/ Mark Sabath*                              */s/ Benjamin A. Luckett*
Mark Sabath                                    Benjamin A. Luckett
Southern Environmental Law Center              Appalachian Mountain Advocates
500 New Jersey Ave. NW, Suite 600              PO Box 507
Washington, DC 20001                           Lewisburg, WV 24901
(434) 977-4090                                 (304) 873-6080
msabath@selc.org                               bluckett@appalmad.org

Tyler Demetriou                                *Counsel for Appalachian Voices, Blue*
Southern Environmental Law Center              *Ridge Environmental Defense*
120 Garrett Street, Suite 400                  *League, Chesapeake Climate Action*
Charlottesville, VA 22902                       *Network, Sierra Club, and Wild*
(434) 977-4090                                 *Virginia*
tdemetriou@selc.org

*Counsel for Southern Alliance for*
*Clean Energy and 7 Directions of*
*Service*

*/s/ Elizabeth F. Benson*
Elizabeth F. Benson
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5723
elly.benson@sierraclub.org

*Counsel for Sierra Club*